O'DONAGHUE <i>vs.</i> M'GOVERN.

A representation to a *bishop* or *church judicatory* having power to hear, examine and redress grievances, in respect to the character or conduct of a *minister of the gospel*, or a member of a church, is *prima facie* a privileged communication, and if made in *good faith*, an action of slander does not lie against the party presenting it; but if the representation be *false* or *impertinent*, made *without probable cause* or *belief in its truth*, the action lies. The *onus* of proving its falsehood and malice is, however, on the plaintiff.

A plea of privileged communication, omitting to deny the falsehood and malice of the charge, and not insisting upon probable cause, is bad. *It seems,* too, that such plea is bad, as amounting to the general issue.

Under the general issue, the defendant may require proof of want of probable cause.

LIBEL. The plaintiff, after stating in the introductory part of his

Albany, January, 1840.—O'Donaghue v. M'Govern.

declaration that he was a *minister of the gospel*, *being a   [ *27 ]
priest of the denomination called Roman catholic ; that he had
been regularly appointed to discharge the duties of priest of the Roman
catholic church of the village of Oswego ; that he had deservedly obtain-
ed the good opinion of his neighbors, of the members of the Roman cath-
olic church at Oswego, and of the bishop and ecclesiastical authorities of
the diocess of New-York, to whom he was amenable as such priest—al-
leged that on, &c. at, &c. the defendant wrote and published a false,
scandalous and defamatory libel, in the form of a letter addressed to the
Right Reverend, Dr. Dubois, catholic bishop of the diocess of New-York,
of and concerning him, (the plaintiff,) his character, moral conduct and
demeanor, and the manner in which he conducted himself in the discharge
of his clerical duties. He then set forth the libel, with proper innuen-
does, in which the defendant, after expressing his reluctance to address
the bishop in an affair in which the bishop was much interested as it re-
spected the purity of his religion, expressed the hope that he would warm-
ly interest himself in putting a stop to a system that had brought *disgrace*
upon the Roman catholic persuasion in Oswego ; and proceeded to state,
that some time since the Rev. Mr. O'Donaghue (the plaintiff) had pub-
licly denounced from the altar the defendant, as being expelled by him,
and that this was done *without any cause*, save that the defendant had
talked with a Mr. Nagle. He expressed his trust that the bishop would,
for the honor of his holy religion, take immediate measures to prevent
such scandal, by removing the plaintiff to some other part of the diocess,
and send a clergyman who would restore peace and brotherly love, unite
instead of divide, " and not until then can peace be reconciled, and the
cause of our religion once more flourish in Oswego." He then charged
that the plaintiff, the last week he was at Oswego, went round to collect
money to *build a church ;* that he collected more or less from every
member—the least sum given by each being one dollar—and the whole
amounting to $400 ; all of which *he put into his pocket*, keeping no ac-
count of the contributions, and then adding, " *this is the last we heard of
our priest.*" He then remarked, that if there was a clergyman
*at Oswego, who would unite the people, " our congregation   [ *28 ]
would almost be as numerous again ;" that he knew twenty or
thirty families who never visited the church, all respectable French me-
chanics, who would contribute liberally if there was another clergyman ;
" numbers of them withdrew last summer, by reason of Rev. Mr. O'Don-
aghue *locking them up, until they would individually pay him half a dol-
lar.*" The defendant pleaded three *special pleas ;* first, *actio non*, be-
cause before and at the time, &c. the plaintiff was a priest or clergyman
of the Roman catholic congregation in Oswego, in the diocess of New-

York, of which diocess the Right Reverend Dr. Dubois was the Roman catholic bishop, wherefore the defendant caused the letter mentioned in the declaration to be written, and sent the same sealed by mail to the bishop, the spiritual superior of both the plaintiff and the defendant, who had full power and authority by the canons of the church, to hear, examine and redress grievances of the kind in the letter specified ; traversing the writing and publication of the letter otherwise than as alleged in the plea, and concluding with a verification and prayer of judgment. The two other special pleas were pleas of *justification*, substantially alike, but the court being of opinion that the justification set up was not as broad as the libel, it is deemed unnecessary to state them. The plaintiff demurred to the pleas. The demurrers were argued at the last January term, by

*I. Williams*, for the plaintiff.

*B. Davis Noxon*, for the defendant.

*By the Court*, COWEN, J. The first special plea is defective in substance. It neither denies that the letter was untrue, nor does it assert that the defendant believed it to be true ; nor does it deny that the falsehoods contained in it were communicated to the bishop maliciously and with intent to injure the plaintiff, as the declaration alleges. It takes the high ground that, because the bishop was the plaintiff's spiritual superior, whose office it was to hear the *charges contained in the letter, and redress the grievances complained of, therefore, the defendant, no matter in what temper or spirit—no matter whether he was conscious at the time of speaking truth or falsehood—might act with absolute impunity, so long as he confined himself to the legitimate channel of communication. The books cited by his counsel come short of maintaining this proposition in its full extent. *Starkie on Slander*, 182 to 194, *Am. ed. of* 1826, *and the cases there cited,* relate to actions of slander for parliamentary and judicial proceedings. Here, I agree, that the party injured must, in general, bring his action as for a *malicious prosecution*, or an action on the case *in the nature of a malicious prosecution*, where any action will lie. Sometimes the person complained of is absolultely protected. This would be so where the libel was published by him in the course of his business or duty as a member of the legislature. The place protects him. So of judges, jurors and witnesses, though in order to insure protection either in parliamentary or judicial proceedings, the party must be acting within the line of his business or duty, as a member of the legislature or as a part of the court, or as a de-

ponent. The same rule extends to all who are incidentally and necessarily employed in copying, printing or distributing documents, pleadings, depositions, &c. so long as they confine themselves to the purposes of informing those who are legally engaged in prosecuting the inquiry to which the papers relate.

When you come to the party complaining or prosecuting, however, he is but *prima facie* protected ; and in an action on the case for false and malicious indictment, information, complaint, or action, it lies with the plaintiff to declare specially, setting forth the proceeding and averring that it was unfounded and malicious.

One who publishes a correct account of proceedings in a court of justice, at such an advanced stage that his publication will not work a prejudice to any of the parties, is also protected. *Starkie on Slander, Am. ed. of* 1826, 195. And we now, I think, come to the line which divides the form of the remedy, between a special action as for a malicious prosecution, &c. *and an action of slander for a libel. If you sue for an injury com- [ *30 ] mitted by some unwarrantable proceeding in a court of justice, you must, in general, resort to the former ; if for a garbled or unreasonable publication of such proceedings, your action is slander for the words ; and the latter remedy applies to all other slanders, whether oral or written, which are *prima facie* privileged. Among these are slander by a person acting in furtherance of his own interest, or that of his friend ; a counsellor or attorney or other professional man, acting in behalf of his client or retainer ; one giving the character of another in answer to an inquiry, for prudential purposes, or criticising a literary work. In all these cases, what is spoken or written may or may not be slanderous, accordingly as either is done in bad faith, or with honest intentions. *Prima facie*, the communication is privileged, but by averring and proving that it was false and impertinent, or made without probable cause and without a belief that it was true, an action of slander can be sustained. Such is the doctrine as collectable from *Starkie*.

A similar doctrine applies to another class of cases treated in *Thorn* v. *Blanchard*, 5 *Johns. R.* 508, and in 2 *Saund. Pl. and Ev.* 801, *marg. paying*, or 373 *of Am. ed.* 1829. These relate to petitions or remonstrances addressed to state officers of the United States, having the power of appointment or removal. The books cited, and all the books agree, that the petition or remonstrance is, in such cases, entitled to about the same measure of protection, so far as the proof may be concerned, as is extended to an informer or plaintiff in a court of justice. The only difference lies in the form of action. For the petition or remonstrance, an action of slander will lie as for a libel, provided the proceeding be *mala fide*. The protection is not absolute ; but the plaintiff may aver and prove, that the communication was false and malicious. This was the doctrine of *Thorn* v. *Blanchard*, and of the cases cited in *Saunders*, who has, at the

page cited and in two or three subsequent pages, also very well condensed the doctrines of *Starkie*, with regard to the matters before men-[ *31 ] tioned. As *I had occasion to consider the doctrine in respect to petitions and remonstrances, in the late case of *Howard* v. *Thompson*, 21 *Wendell*, 319, on the defendant's letters addressed to Mr. Woodbury, secretary of the U. S. treasury, censuring the conduct of the plaintiff as keeper of the public stores, I shall not, at present, go into them particularly. I would merely observe, that the case of *Greenwich Hospital*, *Rex* v. *Baille*, it was understood and stated in *Thorn* v. *Blanchard*, 5 *Johns. R.* 515, from the report in *Esp. N. P. Dig.* 506, 2 *id.* 91, *in Am. ed. of* 1811, *Gould, Banks & Gould*, is evidently put too strongly for the defendant. Lord Mansfield is there made to say, that the remonstrance being addressed in a proper way to a board having it in their power to redress grievances, was not *a publication sufficient* to make it a libel. I had occasion in *Howard* v. *Thompson*, to object to that case, as not containing the further qualification, that the libel was free from the imputation of bad faith. The report in *Holt on Libels*, 184, *Am. ed. of* 1818, is the same as in *Espinasse's Digest;* and in his note to *Wyatt* v. *Gore*, *Holt's N. P. R.* 312, it is stated in the same way. But I am happy to observe, that, on the reference we now have to *Saunders*, the report of the case is there qualified by these words : " *If it be done bona fide with a view of obtaining redress*, as well as addressed in the proper channel." 2 *Saund. on Pl. and Ev.* 374, *Am. ed. of* 1829. The case is thus brought to the line distinctly recognized in *Thorn* v. *Blanchard*, and the subsequent English case of *Fairman* v. *Ives*, 5 *Barn. & Ald.* 642, 1 *Dowl. & Ryl.* 252, *S. C.*, which I also had occasion to notice in *Howard* v. *Thompson*.

Such I consider the settled doctrine in respect to written appeals, which are addressed to the appointing and removing power, instituted by our constitution and laws. The inquiry is, not merely was the redress sought through the proper channel ? but was it also *bona fide ?* I admit that the *onus* on the latter point was with the *plaintiff*. He must aver in his declaration, that the libel was false and malicious ; and he must show this fact on the trial. The defendant may meet him on the general issue ; and, [ *32 ] on its appearing *that the channel was legal, may demand that the plaintiff shall show, negatively, that there was want of probable cause, as he must in an action for malicious prosecution. If the defendant will not rely, as he may, on the general issue, but chooses to plead specially, he must then, at least, deny all malice, or insist that there was probable cause for instituting his complaint. The declaration avers that the complaint was false and malicious, and uttered with intent to injure the plaintiff. The plea must answer all material allegations, or it is defective in substance.

Such is the extent of the citizen's privilege in addressing the civil power

recognized and established by law. His privilege is necessarily great, whether he comes for a redress of private or public grievances. The officer assailed is met with obstructions in the way of his action, generally insurmountable ; but not absolutely so. If he can fasten the charge of wilful falsehood upon the remonstrant, to the satisfaction of a court and jury, the privilege is gone. It is then seen that the remonstrant acted in fraud of the law which conferred the privilege. It was intended as an instrument of protection to men acting honestly in pursuit of redress or punishment, for their own wrongs or those of the public. When they depart from the line of good faith, when they voluntarily, wilfully, falsely, and maliciously injure their neighbours, they are never protected by the law. This only considers the wickedness aggravated, where the injury is committed in its name. Even its own immediate process then ceases to be a shield, and is turned into a sword.

I must be allowed to deny that the law extends any greater measure of protection to a church-member, petitioning a spiritual superior. Churches, in this country are, in a legal point of view, no more than other societies, voluntarily organized by our citizens, with such gradations of officers and judicatories as may subserve the purposes of moral and religious redress. The law concedes the right of petition and remonstrance to a spiritual superior, when they are presented with a view to such redress. The proper channel being pursued, as the plea under consideration in the [ *33 ] case *before us shews that it was, I grant, that the church member in question is entitled to the same measure of protection as if he had, when writing the libel set forth in the declaration, been engaged in seeking the removal of an inferior officer, at the hands of a superior, created by the constitution or the law. But I deny that he is entitled to more. The declaration charges him with falsehood and malice ; with an intent to injure. Let him deny these in his plea ; nay, let him plead mere probable cause, and I will allow his plea, if it be not demurred to as amounting to the general issue ; or if a want of probable cause do not appear upon his trial under the latter plea, I will sanction that as a defence. But when he comes, as he does here, not daring to put even his good faith in issue before the country, I must be excused if I consider his defence as bad in point of law as it is in morals. I deny that he is entitled to any greater consideration than the member of any other voluntary society holding the same relations under a similar organization. Surely there can be no principle on which the law is bound to accord greater privileges to such, than to its own subjects, presenting like remonstrances to its own immediate agents. Here its simple demand is, that the citizen shall so act as not to bring upon himself the imputation of downright falsehood and dishonesty. One would suppose this a measure sufficiently moderate, at least for a man of the defendant's high pre-

tentions as a churchman.   Whereas, accused by his pastor, suspected by his bishop, and diffident of. his own intentions, he puts a plea on the record admitting all the corruption charged upon him, and prays protection in consideration of his privilege.   His privilege to do what?   To belie his immediate spiritual superior in a letter to the bishop!   This is at least a sorry compliment to the law ; and the main argument by which he supports his defence is no less so to a moral community.   It is shortly, that in such spiritual matters as are cognizable by the church judicatories, his integrity ought in no way to be drawn in question by the civil power;—*Cuilibet in arte sua perito est credendum.*   But the maxim does not apply.   The law simply requires that there should not be a want of common honesty in pre-

[ *34 ]   ferring the charge ; a *proposition presenting no peculiar difficulty to a jury, when applied to any transaction of life civil or ecclesiastical.   If any thing occur incidentally which can be explained by ecclesiastics alone, that may be a reason for taking their opinions as witnesses before a common jury, or striking a special one.   The *possible* difficulty of the inquiry is no reason for changing the forum.   But these ecclesiastical matters are supposed to be too delicate for the handling of the lay courts ; and by agitating them in public according to the course of the common law, it is said great scandal may be brought upon the churches.   This I admit is a misfortune which may and does sometimes ensue.   It is common to disputes among all voluntary fraternities: freemasons, and other charitable or literary associations.   So of private families and neighborhoods.   But the law can not for that reason, give up its own jurisdiction.   Should it do so, the trial of all scandalous crimes must be abandoned, a public examination of which will offend the ear of decency.   Beside, in this very article of libel, there are cases in which ecclesiastical strictures alone would be altogether inadequate.   Suppose a church-member should, in a letter like the one before us, falsely accuse his clergyman of an infamous crime, and even conspire with others to ruin him with his bishop; all the church judicatories could do would be to denounce the penalty of excommunication.   And shall society at large be compelled to endure the offender, under the notion of church sanctuary, without the power to inflict its own punishments in damages, fine and imprisonment?   A man who could thus brave the terrors of eternal punishment, would laugh at the idea of excommunication, or any other measure of suffering which a voluntary society could lawfully inflict, by way of public example or private redress.

I am clearly of opinion, both on authority and principle, that judgment should be rendered for the plaintiff upon the demurrer to all these pleas.