THE PEOPLE OF THE TERRITORY OF UTAH,
RESPONDENT, *v.* WILLIAM GLASSMAN AND THE
STANDARD PUBLISHING COMPANY, A CORPO-
RATION, APPELLANTS.

1. CRIMINAL LIBEL.—PUBLICATION LIBELOUS PER SE.—REPORT OF
JUDICIAL PROCEEDING.—MALICE.—In a prosecution for criminal
libel against a newspaper publishing company and the editor
of a paper owned by it for publishing an article libelous *per se*,
which referred to the record in a criminal case, to support
certain defamatory statements, the defendants put a court
stenographer upon the witness stand and asked him to read
from his stenographic notes the testimony given at the trial
referred to in the article, in order to show that the article was
a "fair and true report" of the evidence produced at the trial
and for the purpose of rebutting malice. To this testimony
the court sustained an objection. *Held, error*, since 2 Comp.
Laws 1888, § 4495 provides that no editor is liable to any prose-
cution for a fair report of any judicial proceeding, except upon
proof of malice, which shall not be implied from the mere fact
of publication.

2. ID.—ID.—EVIDENCE.—In a prosecution for criminal libel on a
candidate for public office, the evidence upon which the publi-
cation was made is admissible to rebut malice. King, J., *dis-
senting*.

3. ID.—ID.—CANDIDATE FOR PUBLIC OFFICE.—PUBLIC AND PRI-
VATE CRITICISM.—GOOD FAITH.—REASONABLE OR PROBABLE
CAUSE.—A candidate for public office is amenable to public
or private criticism, made in good faith and based upon rea-
sonable or probable cause, and when he becomes such he is
regarded in law as putting his character in issue in respect
to his qualifications and fitness for the office for which he is a
candidate, since the community has a right to know the char-
acter, habits, mental and moral qualifications of its public
servants.

4. ID.—ID.—COMMENT OF JUDGE.—CHARGE TO JURY.—PROVINCE OF
COURT AND JURY.—In a prosecution for criminal libel, during

the proceedings of the trial the court said: "Now, then, the defendants in this case are charged with publishing certain matters with respect to a citizen of this town, which is libel. It is libelous by its terms, and charges not only crimes but charges maters which are intended to make a man infamous and ridiculous in the eyes of the community." To which the defendants took exception. And in the charge to the jury the court said: "If the matter is false and not shown to be true. there can be no justification for it. There is none in a case of this character." *Held*, *error*, since the court in effect, by its declarations in the presence of the jury and in the charge to them, determined that the defendants were guilty, which was an invasion of the province of the jury, who were the sole judges of guilt or innocence.

(No. 584.   Decided Dec. 9, 1895.   42 P. R. 956.)

APPEAL from the District Court of the Fourth Judicial District   Hon. H. W. Smith, *Judge.*

William Glassman, editor of the Ogden Standard and the Standard Publishing Company, a corporation, were convicted of criminal libel, and appeal.   *Reversed.*

*Mr. L. R. Rhodes, Mr. J. D. Murphy* and *Messrs. Miner & Hiles,* for appellants.

*Mr. J. W. Judd,* United States Attorney, and *Mr. W. L. Maginnis,* Assistant United States Attorney, for the People.

BARTCH, J.:

The defendants were indicted for libel, convicted, and sentenced each to pay a fine in the sum of $500, and the defendant Glassman, in default of payment of fine, to be imprisoned until the same was paid.   A motion for a new trial was overruled, and thereupon an appeal was prosecuted to this court, and many errors assigned.   The indictment, among other things, charges that the defendant

Glassman was the editor of a certain newspaper called the Standard, and that the defendant the publishing company was the owner of the said newspaper; that on the 30th day of October, 1894, the said company unlawfully, willfully, and with malicious intent to injure one L. R. Rogers, did write and publish a false, scandalous, malicious, and defamatory libel of and concerning the said L. R. Rogers. The alleged libelous article charges, substantially, that L. R. Rogers is not a fit and proper person to be elected a member of the constitutional convention, and in support of this position refers to the record in a criminal case,—the trial of one Borel for the murder of one George Lewis. The article states that Lewis, a "sure thing" man, deliberately stole from Borel, who was a sheep herder, $1,600, by means of a certain game of chance; that Rogers had been acting as attorney for Lewis; that Borel was induced to employ Rogers, and pay him a fee of $25, with the understanding that Lewis would be arrested, and the money returned; and that Borel brooded over the matter, became insane, and killed Lewis. The article also refers to Borel's testimony at the trial, and to the fact that it was published in the Standard at that time, and stated that Rogers could have had Lewis arrested and confined, and averted the murder, but, instead of that, Borel was arrested, and confined under bond as a witness. The article further charges that when Rogers was prosecuting attorney six or seven men were arrested for criminal trespass, some of whom were his clients, and were discharged without hearing the prosecuting witness or investigating the case; and that a certain woman of New Orleans, for whom he managed some business concerning an estate, wrote letters to certain business men in Ogden, which did not show him a model administrator. The article then asks the people to defeat Rogers in the election for members to the constitutional convention, in order that dis-

honesty and corruption may be repudiated. The colloquium in the indictment recites that the article imputed to Rogers that when he was prosecuting attorney he was guilty of misfeasance and malfeasance in office, and that, when his friends or clients were charged with crime, he was guilty of dishonest and unprofessional practices, and failed to do his duty as an officer under oath, and was guilty of unprofessional and dishonest conduct in relation to the estate regarding which the letters were written by the woman in New Orleans.

The first question raised in the bill of exceptions which it is deemed necessary to consider is whether the court erred in refusing to allow the witness Gatrel, court stenographer, to read, on the part of the defense, from his stenographic notes, the testimony of Eugene Borel, given on his trial for the murder of Lewis, on the subject of the employment of Rogers by Borel to recover his money, of which he claimed Lewis had robbed him, and as to what Rogers did in the matter. It appears this testimony was offered for the purpose of rebutting malice, and to show that the alleged libelous article, in so far as it related to the subject of Borel's testimony, given in open court, in the case of *People* v. *Borel,* was a true and fair report thereof. This was material, because, if said article contained a fair and true report of such testimony, and was published in good faith, without malice, it was privileged under the statute which provided that "no reporter, editor, or proprietor of any newspaper is liable to any prosecution for a fair and true report of any judicial, legislative, or other public official proceedings, or of any statement, speech, argument, or debate in the course of the same, except upon proof of malice in making such report, which shall not be implied from the mere fact of publication." Comp. Laws Utah 1888, § 4495. Clearly, this staute is broad enough

to include the evidence of witnesses adduced in a judicial proceeding, for such evidence consists of statements made in the course of such proceeding. A newspaper may, therefore, publish a "fair and true report" of the evidence produced in a judicial proceeding, being liable for such publication only when the same is made maliciously, for the purpose of injury. It follows as a necessary consequence that if a reporter, or an editor, or a publishing company becomes the defendant in a prosecution for libel, based on a publication referring to such evidence, such defendant will be permitted to introduce the testimony to which such publication referred, for the purpose of showing that such publication, or any portion thereof, is a fair and true report of such testimony; and, if this be shown, then the publication is so far privileged that no malice will be inferred from the mere fact of publication; and, in such event, in order to convict, the prosecution must affirmatively show express malice on the part of the defendant. The burden of showing that the publication was made with malicious intent is thus cast upon the prosecution, and as to whether or not malice did actually exist becomes a question of fact for the jury, to be determined from all the evidence admitted on the trial. It appears that the prosecution realized the rule of law applicable under the circumstances disclosed by the bill of exceptions in this case, for, in addition to the alleged libelous publication, it introduced in evidence other publications and statements, in making out its case, tending to show malice. The prosecution having done this, the defendant unquestionably had the right to negative malice, and to show that the alleged libelous publication was a fair and true report of the testimony of Borel, given in the judicial proceeding to which such publication referred. For these purposes the evidence in question was proper and material,

and, Borel being without the jurisdiction of the court, the stenographer who took the evidence referred to was a competent witness. In every case where a publication is made the foundation of a criminal action for libel, malice is an essential ingredient, and therefore any evidence which tends to show a want of malice is admissible. So, to rebut malice, any mitigating circumstances, or such as show a justifiable motive, may be admitted, and likewise any evidence which tends to show that the charges contained in a libelous publication are true, because, if a publication defamatory in character is found to be false, it is itself evidence of a malicious intent, and such evidence may be admitted for the purpose of repelling the legal inference of malice, even though it be insufficient in justification. Comp. Laws Utah 1888, § 4492; Cooley, Torts (2d Ed ) 257; *White* v. *Nichols*, 3 How. 266; *Kennedy* v. *Holborn*, 16 Wis. 457; *Holt* v. *Parsons*, 23 Tex. 9; *O'Donaghue* v. *McGovern*, 23 Wend. 25.

It is further complained that in the course of the trial the court sustained an objection of the prosecution to the following question, propounded to the witness Glassman, one of the defendants, by his counsel: "I will ask you to state to this jury upon what evidence the publication was made in the Standard respecting the Borel and Lewis affair." On what ground the objection was based does not appear from the bill of exceptions. It does appear therefrom, however, that the question was asked for the purpose of showing that the publication complained of was not made with a malicious intent, and it is therefore insisted that it was competent, and that the sustaining of the objection was error. The evidence shows that the prosecuting witness, L. R. Rogers, was a candidate for the office of member of the constitutional convention. He was thus seeking to assume the duties of a high public office, in which the public had the gravest and most serious concern. In sus-

taining the objection the court remarked, in the presence
of the jury, that a candidate for office offered his character
to the public to the "extent that private communications
may be made in regard to him." From this statement
the natural inference would be that an editor or manager
of a newspaper had no right to investigate the character
and qualifications of a person who presented himself as a
candidate for office, conferred by the people, and publish
the result of such investigation, if it contained anything
defamatory, without rendering himself liable for libel, no
matter how corrupt or unfit such candidate might be to
be intrusted with public interests. This we do not con-
ceive to be the law, for the rule appears to be well settled
by an unbroken line of authority that every candidate for
public office is amenable to public and private criticism,
made in good faith, and based upon reasonable or prob-
able cause; and when a person becomes such candidate he
is regarded in law as putting his character in issue in re-
spect to his qualifications and fitness for the office for
which he is a candidate. This rule is founded in public
policy, which demands that the conduct, qualifications,
and fitness of persons seeking public positions of trust and
confidence shall be subject to criticism, upon proper occa-
sion, from proper motives, because the community has a
right, and it is to its interests, to know the character,
habits, mental and moral qualifications of its public serv-
ants. Undoubtedly, for this reason, the freedom of the
press was intended to be secured, and a newspaper has the
same right as a private individual to discuss the character
and qualifications of a candidate for office conferred by
vote of the people, being responsible for an abuse of the
right; and not until such abuse occurs does a publication
become an offense against the laws. Likewise in public
policy is founded the rule which forbids a publication of
what is false against a candidate for such office, because

it may deceive the community, and lead to the rejection of the most worthy and-competent persons, to the injury of the public service; and so a publication which is true, if made with malicious intent, and to defame another, is in violation of law.

In Cooley, Torts (2d ed.) p. 256, the eminent author, after stating what the liberty of the press implies, says: "The freedom of the press was undoubtedly intended to be secured on public grounds, and the general purpose may be said to be to preclude those in authority from making use of the law to prevent full discussion of political and other matters, in which the public are concerned. With this end in view, not only must freedom of discussion be permitted, but there must be exemption afterwards from liability for any publication made in good faith, and in the belief in its truth, the making of which, if true, would be justified by the occasion. There should consequently be freedom in discussing, in good faith, the character, the habits, and mental and moral qualifications of any person presenting himself, or presented by his friends, as a candi-date for a public office, either to the electors or to a board or officer having powers of appointment." This doctrine is very clearly stated in *Com.* v. *Clap*, 4 Mass. 163, by Mr. Chief Justice Parsons, as follows: "When any man shall consent to be a candidate for a public office conferred by the election of the people, he must be con-sidered as putting his character in issue, so far as it may respect his fitness and qualifications for the office. And publications of the truth on this subject, with the honest intention of informing the people, are not libel; for it would be unreasonable to conclude that the publication of truths, which it is the interest of the people to know, should be an offense against their laws. * * * For the same reason the publication of falsehood and calumny against public officers is an offense most dangerous to the

people, and deserves punishment, because the people may be deceived, and reject the best citizens, to their great injury, and, it may be, to the loss of their liberties." Newell, Defam. §§ 134, 135; *Belknap* v. *Ball*, 83 Mich. 583, 47 N. W. 674; *White* v. *Nichols*, 3 How. 266; *Crane* v. *Watters*, 10 Fed. 619; *Jackson* v. *Pittsburg Times* (Pa. Sup.) 25 Atl. 613; *Marks* v. *Baker*, 28 Minn. 162, 9 N. W. 678; *Sweeney* v. *Baker*, 13 W. Va. 158, 183; *Wheaton* v. *Beecher*, 66 Mich. 307, 33 N. W. 503; *Mott* v. *Dawson*, 46 Iowa, 533. The same doctrine appears to prevail in England, for there communications made to persons in the discharge of some public or private duty, whether legal or moral, concerning candidates for office, or affairs where the interests of the public are concerned, are privileged, unless express malice is shown. 2 Kent, Comm. *22; Newell, Defam. §§ 141, 142; *Fairman* v. *Ives*, 5 Barn. & Ald. 642; *Rex* v. *Burdett*, 4 Barn. & Ald. 131; *Woodward* v. *Lander*, 6 Car. & P. 548; *Lewis* v. *Walter*, 4 Barn. & Ald. 605.

It is evident that the prosecuting witness in the case at bar, when he became a candidate for office, offered his character to the public so far as his qualifications and fitness for the office were concerned; and the publication on which the indictment was founded, though defamatory, having criticised and challenged the qualifications and fitness of such candidate, belongs to that class of privileged communications which is protected, if made in good faith, and upon reasonable and probable cause, and without malice. In such case malice is not presumed. Comp. Laws Utah 1888, § 4497. Hence, the prosecution having introduced evidence which tended to show that the publication was made maliciously, it was competent for the defendants to rebut such evidence, and free themselves from the imputation of malice, by showing not only upon what evidence the publication was made, but also the circum-

stances under which it was made, the sources of their information, and the facts tending to show the motives which induced the publication, to enable the jury to pass on the question whether or not the publication was in fact malicious, as being made in bad faith, or without probable cause. Some of the charges contained in the publication having been based upon the testimony in the Borel trial, the witness Glassman should have been permitted to answer the question under consideration, because it related to the source of information, and tended to elicit facts material in the determination of the question of malice by the jury. *Wilson* v. *Fitch*, 41 Cal. 363; *Bailey* v. *Publishing Co.*, 40 Mich. 251; 1 Ersk. Speech. (High, Ed.) 160–208 *et seq.*

In further defining its position in sustaining the objection just considered, the court used the following language, as appears from the bill of exceptions: "Now, then, the defendant in this case, or the defendants in this case, are charged with publishing certain matters with respect to a citizen of this town, which is libel. It is libelous by its terms, and charges not only crimes, but charges matters which are intended to make a man infamous and ridiculous in the eyes of the community." It is insisted that by the use of this language the court declared the defendant guilty of the offense charged, in the presence of the jury, before the case was submitted to them. That such a strong expression of the views of the court, within the presence of the jury, in relation to the character of the publication which was the foundation of the indictment, and the thing which it was the province of the jury to determine, was unfortunate, must be conceded, because it doubtless conveyed to the jury the fact that, in the opinion of the court, the matter contained in the publication was a libel. If this were so, then the only question to be determined by the jury, in order to convict, would be whether the

defendants made the publication. Under these circumstances it is impossible to say that the declarations of the court which would at once dispose of the question of malice—the real issue in the case—did not prove disastrous to the defendants by prejudicing the minds of the jury against them. Especially is this so when such declarations are considered in connection with certain language used in the charge of the court in respect to the character of the publication, which language is as follows: "If the matter is false, and not shown to be true, there can be no justification for it. There is none in a case of this character." The court having previously refused to allow the witness Glassman to state upon what evidence the publication was based in relation to the Borel affair, the defendants were unable to show the material facts upon which they relied in justification; and therefore the opinion of the court, expressed in the presence of the jury, that the publication was a libel, was rendered yet more prejudicial to their rights by the instruction that there was no justification in a case of this character. In effect, the court, by its declarations in the presence of the jury, and its instruction to them, determined that the defendants were guilty. This was error, because it was an invasion of the province of the jury, who were the sole judges of guilt or innocence.

We do not deem it necessary to discuss the other questions raised in the bill of exceptions, since it is apparent from those already considered that the defendants are entitled to a new trial. The judgment is reversed, with directions to grant a new trial.

Merritt, C. J., concurs.


King, J.:

This case is reversed upon three grounds. I agree with the majority of the court in the judgment of reversal, and

with the views expressed in the question first discussed in the opinion, but I dissent from the conclusions of my brethren reached in the two remaining questions considered by them.

1. The record does not disclose whether or not the publication alleged to be libelous purports to have been made upon the authority of another. For the purpose only of disproving malice may a defendant in a case of this character show that he was not the author of the publication, and all of the authorities unite in expressing the view that evidence of this character is only admissible when the publication itself indicates that it was made upon the authority of another. The question, "State upon what evidence the publication was made in the Standard respecting the Borel and Lewis affair," would be proper, and the answer thereto admissible, if the defendant, when publishing it, had stated the "evidence" upon which the publication was based, and the information upon which it was founded. This question was discussed at some length in the case of *Fenstermaker* v. *Publishing Co.* (just decided by this court) 43 Pac. 112, *post*, p. —, and the view here taken was there announced as the law, and I think the numerous authorities there cited unerringly indicate the erroneous position taken by the majority of the court in this case upon this proposition.

2. During the progress of the trial frequent discussions arose between the court and counsel respecting the admissibility of testimony. While these discussions were in the presence of the jury, they were not for the jury. The court stated to counsel that: "The defendants is this case are charged with publishing certain matter with respect to a citizen of this town, which is libel. It is libelous by its terms, and charges not only crimes, but charges matters which are intended to make a man infamous and ridiculous

in the eyes of the community." This, together with one of the sentences of the charges of the court, viz.: "If the matter is false and not shown to be true, there can be no justification for it;. there is none in a case of this character,"—is held to be reversible error. There was no complaint that the court persistently during the trial made statements calculated to influence the jury and prejudice them against defendants, and I do not think that the statement made in answer to arguments made by counsel respecting legal propositions was sufficient, even in connection with the words quoted from the charge, to constitute error. I concede the trial court ought to be cautious in their expressions concerning the vital points of the case in the presence of the jury, but it is impossible for the court to answer various questions raised by counsel, and intelligently decide upon objections raised, without expressing views upon material questions; and especially is this so in a case of this kind, where the publication is libelous *per se*, and where the publication is admitted, and the only defense is justification. Moreover, the legal and technical discussions ensuing between court and counsel are lost to the jury, and from the record in this case I cannot see that defendants were in any manner prejudiced by these statements.