WILLIAMS v. STANDARD-EXAMINER PUB. CO. et al.

No. 5106.   Decided November 28, 1933.   [27 P. (2d) 1.]

*George C. Buckle,* of Ogden, for appellant.

*Stuart P. Dobbs,* of Ogden, for respondent.

ELIAS HANSEN, J.

This action was brought by the plaintiff to recover from the defendants damages because of the alleged false and defamatory publication on July 14, 1929, of an article in a newspaper, known as the Standard-Examiner, owned by the defendant Standard-Examiner Publishing Company, a corporation. The trial resulted in the plaintiff securing a verdict and judgment against the defendant corporation for the sum of $3,000. A verdict of no cause of action was returned by the jury as to the defendants Abraham L. Glassmann, Joseph U. Eldredge, Jr., and James P. Casey. The defendant corporation appeals. Its assignments of error attack the judgment appealed from upon the following grounds: That the evidence does not support the verdict and judgment; that the trial court erred in the reception and rejection of evidence; in the instructions given to the jury; in refusing to give certain of appellant's requested instructions; and that the court erred in refusing to grant appellant a new trial. The insufficiency of the evidence to support a verdict for the plaintiff was raised in the court below by a motion for a nonsuit at the conclusion of plaintiff's evidence in chief and by a motion for a directed verdict for the defendants and each of them at the conclusion of all of the evidence. The motions were based upon defendants' claim that the publication complained of was shown by the evidence to be a qualifiedly or conditionally privileged communication and as such required proof of actual malice on the part of the defendants and that no such proof was offered, and upon the further ground that the evidence showed that the facts stated in the publication were true, and that the comments and criticisms appearing in the publication were fair and proper. Both motions were denied. Appellant assigns such rulings as error.

In the main the pleadings of the parties and the evidence given in support thereof agree upon the facts which occasioned the publication concerning which plaintiff complains. The following facts are either alleged and admitted in the pleadings or established by uncontradicted evidence: The defendant Standard-Examiner Publishing Company is a Utah corporation. For many years past it has printed and published a daily newspaper at Ogden, Utah. The paper, known as the Ogden Standard-Examiner, had an extensive circulation in Ogden City and Weber county, Utah. A few papers were sent to other parts of the state and neighboring states. The defendants Joseph U. Eldredge, Jr., James P. Casey, and Abraham L. Glasmann were, at the time mentioned in the complaint and at the time of the trial, the general manager, the associate general manager, and the editor, respectively, of the defendant corporation. During the years 1928 and 1929 plaintiff was one of the duly elected, qualiified, and acting members of the board of commissioners of Ogden City, Utah. Soon after he qualified as a city commissioner he was assigned to the duty of supervising the waterworks department of the city. He continued in charge of that department up to the time of the trial of this action. Ogden City secured its water supply for domestic, culinary, and other purposes from forty-two artesian wells and three small streams located in the Ogden river watershed. The streams were known as Wheeler creek, Warm Water spring, and Cold Water creek. The artesian well water was conveyed from the wells by means of a pipe line into two distributing reservoirs. Wheeler creek, after flowing approximately two miles in an open stream, was (when the water supply from other sources was insufficient to supply the needs of the city) diverted into the pipe line which connected with the pipe line which conveyed the water from the artesian wells. The Wheeler creek water was thus commingled with the water from the artesian wells. A distributing system of pipes carried the water from the distributing reservoirs to the inhabitants of Ogden City. The Wheeler creek water had,

for a number of years prior to 1928, been used to supplement the water secured from the artesian wells, Warm Water spring, and Cold Water creek whenever the water from those sources was insufficient to supply the needs of the city. During the summer of 1928 the Utah state board of health made an investigation and report of the Ogden City water supply. The report so made reads as follows:

"The supply is derived from forty-three wells and from three small creeks located on the Ogden River watershed, and is delivered by two distributing reservoirs to the city distribution system.

"Wells: The wells are located near where the Forks of the Ogden River converge in a natural gravel basin. The average flow from the wells is 9,500,000 gallons per day, which may be increased to 16,000,000 gallons per day. However, there is no meter or measuring device to determine the amount of water supplied by the wells. The State Water Engineer has measured the flow from time to time but other than his measurements the city has no way of knowing accurately how much water is supplied by the wells. The average depth of the wells is approximately 140 ft., some being as shallow as 90 ft. At the time of the investigation eight wells were being operated by the use of air pressure. Twenty-two of the wells are connected to air pumps. The water from the wells passes through three miles of 36 in. wood stave pipe to a collection box near the mouth of Wheeler Canyon. The water from Wheeler Canyon enters the box and together it is conveyed through two lines, a 34 in. wood stave pipe and a 24 in. Kalemein pipe down the canyon, a distance of five miles, passing over the hill through a steel pipe and to the distributing reservoirs through a 35 in. wood stave pipe.

"Wheeler Creek: The Wheeler Canyon intake is located approximately one-fourth mile above the Pine View Lodge and Summer Resort. The flow is diverted by a concrete dam into two 8 in. wood stave pipes, which converge in a collection box below resort and the remaining distance of 1,500 ft. to the point where Wheeler's Canyon supply enters the well supply is a 12 in. kalemein pipe. The water from the springs in Wheeler Canyon flows in an open stream for possibly two miles before it is diverted into the pipe line.

"The water shed above the intake is subject to serious potential contamination from day camping and picnicking parties. A sign near diversion dam warns people not to contaminate their culinary supply, but no signs were posted along the stream above the intake. A beaten trail leads up this canyon, which is often used by hiking parties. Cantaloupe rinds and empty cans caught on the grating of the intake were mute evidence of human contamination. Some cattle also graze

on the upper watershed, which adds another source of pollution to the canyon supply.

'There are no means provided for accurately measuring this supply, but it is approximately 4 second ft., or roughly 2,500,000 gallons per day.

"Cold Water Creek: The water is diverted from the creek by a concrete dam, one-fourth mile from Ogden Canyon Highway, into a wood stave pipe line and enters the main supply line at the roadway. This canyon is a favorite haunt for picnics. The amount of water obtained from this supply is approximately 648,000 gallons per day.

"Warm Water Spring: The Warm Water Spring is about one-half mile below Cold Water Spring intake. Very little water is obtained from this source, estimated at ¼ second ft., or approximately 162,000 gallons per day.

"Contamination: During the summer months when the volume of available water from the streams is reduced, the number of visitors to the canyons is great, a goodly number of these are flagrantly careless from a sanitary standpoint, as proved by indications of contamination found near the streams. The danger of chance pollution by visitors on the drainage area is great. In this day few spots are so remote as not to attract the attention of visitors, many of whom dispose of their waste regardless of consequences.

"It is impractical to attempt to sanitate water sheds by adequately policing them. Wastes washed into stream water supplies during fall rains may lead to disastrous results in Ogden City. Drinking water from a surface source should be subjected to adequate storage and treatment.

"The bacteriological analyses from the Ogden supply during the summer months substantiate the sanitary survey findings of the pollution of the city water supply. The finding of the Bacillus Coli, an inhabitant of the intestinal tract, in a water is a certain indication of contamination with animal or human excreta. Since there are typhoid carriers at large, and also people convalescing from the disease, but still harboring the bacilli, the possibility of contaminating the water with typhoid organisms is very great.

"When there is reasonable possibility of a disease outbreak due to a polluted water supply it behooves the responsible city authorities to take all necessary measures to protect the people.

"Consumption: There are no records of consumption. The maximum consumption is 15,100,548 gallons per day, and the minimum, 7,724,781 gallons per day. The estimated consumption per capita is 350 gallons per day, which exceeds any reasonable requirements. At the present time the city is divided into districts, each of which is allowed to use

water for sprinkling purposes for two hours in the morning and two hours in the evening. Only about 8% of the city is metered, including the commercial and industrial districts. Large quantities of water are evidently wasted by a defective distribution system. A pitometer survey made in 1924 showed that 587,000 gallons per day were wasted on account of defective plumbing, and 2,500,000 gallons per day wasted on account of neglectful use and defective lines.

"Storage Capacity: Two rectangular reservoirs lined with concrete containing 21,500,000 gallons of water furnish the only storage supply. The reservoirs are supplied by individual branches and supply the distribution system through two 20 in. lines. Either of the reservoirs may be by-passed. Recently the city has had some difficulty with Sea Gulls lighting upon the water during the molting season and contaminating it.

"The water passes over a sharp crested weir, with no end contractions as it enters the reservoirs. A recorder determines the amount of water passing over the weir. At the time of the investigation there was .97 ft., or 19.086 cu. ft. per second, or 12,335,604 gallons per twenty-four hours. The weir is so located and arranged that when the reservoir fills up the water backs up into weir house, giving a false and inaccurate reading on the automatic registering device. This occurred on the night of July 12th. There is no venturi meter or other device to record consumption on outlet from the reservoirs.

"Dead Ends: Gridironing is quite complete in the closely built up sections of the city, but in outlying districts dead ends are numerous. Approximately 10% of the total amount of pipe is in dead ends. Complaints were made that whenever the pressure is low those living on dead ends receive turbid water from sediment which had collected in the dead end lines.

"Distribution System: Much of the distribution system is in poor condition. As many as two leaks a day occur in some parts of the city. The old Matheson Steel Joint Pipe has been repaired, but much of it should be replaced with a more permanent and durable pipe line. The feeders to the distribution system are inadequate. The main arteries are well arranged and of good size, but additional supply mains and secondary feeders are needed to give adequate pressure in some parts of the city. There is too much 2 in. pipe in the system, especially is this true in certain sections of the city. The dead ends could be eliminated by inexpensive extensions and the quality of the water would be greatly improved.

"Recommendations: The establishment of a good waterworks system which is self-supporting is the first step in civic progress, and demands the attention of the city officials.

"The most satisfactory and fair way of adjusting water rates is by a meter system. It has been proved that people use twice as much water wastefully when not on meter system. We recommend a comprehensive plan of installing several hundred meters each year.

"In view of the fact that the Wheeler Canyon supply is the largest stream supply, and inasmuch as this supply will be subject to human contamination with its increase in popularity in the future, we recommend that the supply be chlorinated during the summer months from May 25th to October 15th, and longer if necessary. A method of treatment is desirable which can provide water free from disease organisms; can be satisfactorily operated by intelligent but not necessarily expert waterworks attendants; is dependable and subject to strict control at all times; is economical in first cost and in operation. Such a method is sterilization by liquid chlorine. The amount of chlorine used to treat the Wheeler Canyon Supply would be so small as not to be detectable in the city supply.

"The lower temperatures allow the typhoid bacilli to exist much longer than the higher temperatures. The concentration of bacteria in a stream flowing 5 second ft. will be greater than in one flowing 50 second ft. For this reason all trespassing in Cold Water Canyon and Warm Water Spring Canyon should be strictly prohibited. Signs should be posted near the intake warning people not to trespass above intakes. The supply in Cold Water and Warm Water Springs is very limited and pollution after rains is very evident.

"The present storage capacity should be increased to give the city adequate fire protection, as well as an adequate and safe culinary supply.

"It is valuable information for the city to know the amount of water flowing from the wells and from the creeks each season. It can only be accurately measured by installing weirs or other measuring devices, in order to determine the amount of water lost in transportation.

"The reservoir outlets should be equipped with venturi meters to determine the amount of water delivered to the distributing system.

"It is needless to say that to permit water to enter the system at any place from the Ogden or Weber Rivers is very dangerous and may be disastrous to the city.

"The use of cross connections between a safe water supply and a questionable supply should be prohibited by city ordinance.

"It is important that the present worn-out pipe be replaced with permanent pipe, and that all replacements and enlargements be made in accordance with an engineering plan.

"The dead ends should be eliminated as soon as possible by a more closely gridironed system.

"The distribution system is also far from adequate. It is in this respect that town officials are most liable to underestimate future needs. This is often a costly and serious error. Pipe lines that are outgrown and are leaking badly will so consume the pressure as to render the supply practically useless in case of a fire. It often costs five or ten times as much to tear up and replace outgrown pipe later as to install pipe of ample size in the beginning.

"Feeders to the system should be of sufficient size and be looped so that no district will depend upon a single feeder. It is important that foresight be used in determining the size of pipe necessary. Pipe should be sufficient size to provide for ordinary domestic consumption plus the fire flow without causing excessive pressure loss, which is prevalent in many of our city systems today.

"The court has ruled that 'water is a necessity of life' and one who undertakes to trade in it and supply customers stands in no different position to those with whom he deals than does a dealer in food stuffs. He is bound to use reasonable care that whatever is supplied for food or drink shall be ordinarily pure and wholesome.

"An adequate and safe water supply is a city's greatest asset, and we suggest that the city administration give the water system their first attention.

"We trust this information may be of value to the administration in conducting the waterworks system efficiently and economically, and assure you our support if we can be of service."

Copies of the foregoing report, together with copies of bacteriological tests made by the bacteriologist of the state of Utah, were forwarded to and received by the board of commissioners and the board of health of Ogden City. Most of the tests of Wheeler creek water made by the state board of health during the year 1928 showed that the water of that creek contained colon bacilli to such an extent that it was unsafe for culinary uses. During the late summer, fall, and winter of 1928 considerable correspondence was had between the Utah state health department and the plaintiff city commissioner in charge of the waterworks system of Ogden with respect to the city water supply, especially as to the water of Wheeler creek. It appears that passenger trains engaged in interstate commerce when passing through Ogden were using water from the Ogden City water system. It also appears that the bureau of public health service of

the United States, in order to insure a proper water supply for interstate passenger trains, relied upon the Utah state board of health for information as to the water which was supplied to such trains. After it was determined that the water of Wheeler creek was contaminated, the health department of Utah informed the commissioners of Ogden City that it would no longer certify that the water of Ogden was safe for culinary and domestic purposes unless the water from Wheeler creek was kept out of the water system of Ogden or something was done to purify that water. A meeting was finally called to discuss and if possible agree upon what should be done in the matter. The meeting was held in the latter part of the year 1928. There were present at that meeting the plaintiff and the mayor of Ogden City, Dr. T. B. Beatty, health commissioner of Utah, and representatives of the Ogden Union Depot & Railway Company. An agreement was finally reached whereby the plaintiff and the mayor of Ogden City promised that the water from Wheeler creek would not again be turned into the mains of the city until the city had constructed and put in operation a chlorinator for the chlorination of the water of Wheeler creek. In reliance upon the promise so made by the commissioners of the city, the Utah state board of health certified to the United States public health authorities the use of Ogden City water upon trains engaged in interstate commerce. In the budget for the expenses of Ogden City for the year 1929, an item was included for the purchase and installment of a chlorinator for use on Wheeler creek. Early in the year 1929 a chlorinator was purchased and later a contract was let for the construction of a building in which to place a chlorinator, but the same was not installed until after the occurrence of the matters involved in this controversy. On June 14, 1929, the water of Wheeler creek was turned into the water system of Ogden. On June 16th a heavy rain fell on the watershed of Wheeler creek. Soon after the rain began to fall the water of Wheeler creek was turned out of the city water system because when it

rained the water of that creek became turbid. The water of Wheeler creek was again turned back into the Ogden City water system about a week or ten days after it had been turned out.

The plaintiff was absent from Ogden City in Portland, Or., from June 14th to July 6th. Early in July, 1929, samples of water from the Ogden City water system were taken and tested in the laboratory of the state board of health. Some of the samples so taken and tested showed a high number of coli bacillus. The laboratory tests were made on July 5, 1929. On the next day, July 6th, T. B. Beatty, state health commissioner, called the mayor of Ogden on the telephone and informed him of what he had ascertained about the presence of coli bacillus in the water supply of Ogden and that evidently Wheeler creek water was again being turned into the city mains without being chlorinated. The mayor requested Dr. Beatty to write him a letter about the matter. Accordingly, on the same day Dr. Beatty wrote and mailed a letter to the mayor and the city commissioner of Ogden wherein the doctor stated:

"You are advised that the report of the Laboratory examination of sample of water taken from the Ogden City Water Supply July 1st shows a high degree of contamination. (Copy of report enclosed.) I am informed that the Wheeler Canyon Water had been turned into the water system, which doubtless accounts for the contamination, as a separate test of the water taken from the wells was Negative.

"You will recall that you were requested by the State Board of Health last year to discontinue the use of the Wheeler Canyon water until chlorination apparatus should be installed and operated for the purpose of sterilizing the water, which was proved to be dangerously impure.

"I understand that the city has purchased the apparatus but has neglected to have it installed. The Board of Health must insist that this shall be done immediately and that the Wheeler Canyon supply shall be turned off until the chlorinator is in operation.

"The Board has certified the water supply to the United States Public Health Service for use on trains, with the understanding that it should be sterilized and we shall be obliged to withdraw such certification unless the above requests are complied with."

The foregoing letter was delivered to plaintiff on July 8th. As soon as the letter was read by plaintiff, he ordered the water of Wheeler creek turned out of the water system and the Wheeler creek water was accordingly turned out on July 8, 1929, and was not again turned back into the water system until the chlorinator was installed and in operation. In the latter part of June and early in July a number of inhabitants of Ogden City became sick from what later was determined to be typhoid fever. There is some evidence that one or two of the persons who had typhoid fever had symptoms of that disease early in June of that year. On July 11, 1929, Dr. Savage, the city health officer of Ogden City, called Dr. Beatty on the telephone and informed him that considerable sickness had developed in Ogden and that the nature of the sickness was rather obscure; that no diagnosis of the disease had been made. After some conversation as to the nature of the disease, Dr. Beatty asked why Dr. Savage did not suspect typhoid fever. On the following day, July 12, 1929, Dr. Beatty went to Ogden, where he consulted with the city commissioners and the city health officer of Ogden City, regarding the water situation and the disease which had broken out in that city. He was also interviewed by a representative of the defendant corporation. In that interview the doctor informed appellant's representative that the water of Wheeler creek was under suspicion and that the state board of health would make an investigation; that the city commissioners had failed to keep their promise not to turn the water of Wheeler creek into the water system of Ogden until it was chlorinated; that the people of Ogden should be advised not to drink the water of Ogden City until it was boiled. The representative of appellant stated that if they published anything derogatory to the water supply of Ogden they would get hell, to which the doctor responded that they might get hell but that they would save human lives. It was further stated in that interview by Dr. Beatty in substance that in this age of sanitation it is manslaughter to permit a water supply to become

contaminated with typhoid in a city the size of Ogden, and that he was advised the courts have so held.

In the evening issue of July 12th the defendant corporation published an article wherein the citizens of Ogden were urged to boil the water taken from the Ogden City water supply. The article stated that Dr. Beatty, state health commissioner, and Dr. Savage, city physician of Ogden, had determined that the mysterious malady of which there were six cases in Ogden was typhoid fever and that there were several other patients with symptoms which indicated they had typhoid fever. Suspicion, the article stated, pointed to the source of the disease as being water from Wheeler creek. The article reported the views of Dr. Beatty and Dr. Savage and some other physician as to the source of the threatened typhoid epidemic. Plaintiff makes no complaint of that article. On July 13th at the suggestion of the Ogden Commercial Club two meetings were held at which were present representatives of the commercial club. The mayor and both commissioners of Ogden City were present at the forenoon meeting and the mayor and plaintiff attended the afternoon meeting. City Physician Dr. Savage attended the meetings, as did also representatives of the defendant corporation. Fred Packard, superintendent of the Ogden City waterworks, attended the afternoon meeting. At the forenoon meeting the president of the commercial club stated that pursuant to public demand the club desired to assist the city commissioners in every way possible to clear up the water and typhoid situation which existed in Ogden. Mr. Williams was questioned at some length as to why it was the Wheeler creek was turned into the water system, especially in view of the fact that a promise had been made by the commission that the water of that creek would not be used until it was chlorinated. Mr. Williams stated that he, as head of the waterworks department, assumed the responsibility for turning the Wheeler creek water into the Ogden water system; that his shoulders were broad enough to carry that responsibility; that he did not

believe the Wheeler creek water was responsible for the typhoid fever; that the water of Wheeler creek had been used to supplement the city water supply for many years; that the city had purchased a chlorinator for the chlorination of water from Wheeler creek, but the same had not been installed; that the water of Wheeler creek had been turned into the city water system while he was away on his vacation; that immediately upon the receipt of the letter of July 6th from Dr. Beatty the water of Wheeler creek was turned out; that the air pumps on the artesian wells were started soon after the water from Wheeler creek was turned out; that the people of Ogden were using an excessive amount of water; that if the residents of Ogden would not waste water there would be sufficient without the use of the pumps on the wells to supply all legitimate demands; that upon the suggestion being made that the drinking fountains of the city be turned off, it was stated by some of those present that it would be a great detriment to the reputation of Ogden water supply if the newspapers were to publish a condemnation thereof. City Physician Dr. Savage stated an investigation was being made to ascertain the source of typhoid infection, but that no common source had been found except the water supply.

At the afternoon meeting Mr. Packard, superintendent of the city waterworks, was questioned concerning the city water supply and why it was that Wheeler creek water had been turned into the system. He stated that the Wheeler creek water was turned into the system when the supply became low the same as had been done in other years; that no one had told him not to turn the water in; that he had never heard of an agreement whereby the water of Wheeler creek was not to be used until chlorinated; that he did not believe the typhoid epidemic was caused by the water from Wheeler creek because a number of families were living in Ogden Canyon and using Wheeler creek water, but none of the members of those families had contracted the disease;

that since the water of Wheeler creek had been turned out of the system the city reservoir had fallen; that Wheeler creek was turned out on July 11th; that with the use of the pumps on the wells there was a sufficient water supply if the people of Ogden would cease wasting water. It was agreed at that meeting that the water in the dead ends of the city water mains would be cleaned out and that an effort would be made by the city water department to prevent unnecessary waste of water. In the evening issue of July 13th of appellant's paper, a report of the forenoon meeting of that day was published, as was also a news item stating that two persons had died of typhoid fever and that many others were ill of that disease. There was also published a copy of the letter which has heretofore been quoted in this opinion written by Dr. Beatty to the city commission under date of July 6, 1929. Notice was also given that the state board of health had arranged for a free source of serum for inoculation against typhoid fever, and that every one was advised to take that treatment. Dr. Beatty was quoted as having said that, "Typhoid is manslaughter in these days of modern sanitation." No complaint was made of the publication of July 13th.

In the issue of the appellant's newspaper of Sunday morning, July 14th, appeared the publication of which plaintiff complains. Some of the language complained of appeared in an editorial, some in an article under the heading, "Blame Placed in Water Pollution, Williams Avers He's Responsible for Bad Supply," and some in an article under the heading, "Boil Your Water, Don't Drink From Fountains." The complaint alleges:

"That on the 14th day of July, 1929, the said defendants, intending to injure, malign, and defame the plaintiff, maliciously published of and concerning the plaintiff, as an individual and in his said official capacity, in the regular issue and Sunday edition of said newspaper, on said day, on prominent pages thereof, where the same would be most readily seen and read, the following libelous and defamatory words:

" 'Blame Placed in Water Pollution'

" 'Ogden is facing an epidemic of typhoid fever due to criminal carelessness on the part of the City Water Department in polluting the water supply. Defying the written order of the state board of health, the waters of Wheeler Canyon were turned into the City mains. The Water Department made the promise that it would install a chlorinator to purify this water, but now after the damage has been done, Fred Williams, the water commissioner, admits that the chlorinator was never used.

" 'A typhoid epidemic in a city the size of Ogden is nothing short of manslaughter. Better men than those responsible for this situation are wearing stripes for lesser crimes. Two citizens have died from typhoid within twenty-four hours. Many others are ill with the disease, and the number of cases is increasing daily.'

" 'Williams Avers He's Responsible For Bad Supply.'

" 'Commissioner Fred E. Williams of the Waterworks Department admitted yesterday that if there was any blame to be placed for the use of the Wheeler Creek water, he would accept responsibility. Further, he asserted, my shoulders are broad enough to carry it.'

" 'Typhoid Fever Is Manslaughter.'

" 'The present epidemic of typhoid fever in Ogden is nothing short of manslaughter and the responsibility for the crime rests squarely on the shoulders of the city commission. Two citizens have died from the disease within 24 hours and several others are critically ill, while the number of cases is increasing daily.

" 'The city commission and a few of their weak-kneed friends are sending up the howl that it is giving Ogden a bad name to put the real situation before the public and thereby giving the residents of this city an opportunity to protect themselves and their families from the ravages of this disease. A newspaper that would withhold this news from the public or in any way shield the bunglers who perpetrated this crime would not be worthy of its name as a purveyor of news and furthermore it would become an accessory after the fact. So the city commission and the public at large may take notice here and now that The Standard-Examiner's first duty is to the citizens of Ogden and the whole dirty deal will be exposed in the interests of public health and with the hope that a repetition of the crime may be forestalled in the future.

" 'Fred E. Williams, water commissioner, says the polluted waters of Wheeler Canyon were turned into the city mains last summer. This was done in secrecy over the written protest of the state board of health and without giving water users an opportunity to protect themselves. Again this year the crime was repeated. However, Mr. Williams made a public statement saying he would install a chlorinator.

He was forced to admit yesterday that he lied—the chlorinator was never installed, but the pipe line from Wheeler creek was running full.

" 'The commission has been transferring about $75,000 a year from the waterworks department to the general fund—money that should be used to increase the water supply and improve the service. Yet they could not afford to pay $300 to install a chlorinator and they could not start the pumps at the wells until public opinion put the thumb screws on them. The chamber of commerce has just completed a drive for $29,000 to advertise Ogden as a good place to live. It would take several times that sum to restore two lives already lost and bring back to health those who are critically ill because of this criminal blunder of the waterworks department.

" 'Talk about giving Ogden a bad name by warning the citizens to protect their health against such vicious incompetency. It will take heroic and combined efforts of all citizens who have backbones instead of wishbones to restore the bad name painted on the city's door by these czars of the city hall.

" 'If Mr. Williams as head of the waterworks department is solely responsible for this crime the public should demand his immediate resignation. If he refuses to resign he should be impeached. If the responsibility is divided among the three commissioners as it should be, they should all resign or be impeached. Ogden must make it impossible for such crimes to be repeated. When the water supply is deliberately polluted and a deadly disease turned loose upon the community there is no time for quibbling, evasions and excuses. Such incompetency cannot be neutralized.

" 'This tragedy must be corrected and it is the duty of every citizen interested in his home and the future growth of the city to lend a hand. We must let the world know that the city of Ogden is able to protect the health and life of all who come. Typhoid fever is manslaughter. Who is responsible?' "

Other articles published in appellant's newspaper after the publication of July 14th were received in evidence upon the theory that they may have a bearing on both the questions of malice and the amount of damage, if any, that should be awarded by the jury. In the issue of July 15th there appeared two articles, one under the heading, "Continue To Boil Water," and the other under the heading: "Packard Resigns As First 'Goat' in City Scandal. Commissioner Williams declares full charge of running depart-

ment was left to Packard and he has accepted responsibility; Coldwater Canyon water warning issued; Police guard at Williams' home; M. E. Wilcox says Wheeler was turned in early in June." In the issue of July 16th two articles were published, one an editorial entitled, "Citizens of Ogden, Demand The Resignation of Williams," and one under the heading: "Danger Passing; City Water Soon to Become Safe. Doctor Beatty Reports Samples are Negative and Williams Reports Dead Ends Are Being Flushed; Inspectors Catch Water Wasters; Dr. Ezra C. Rich Issues Statement on Situation, Saying Wheeler Creek is Contaminated and Should Not Be Used." In the issue of July 17th two articles were published, one an editorial entitled, "Peery's 'Yes' Man Changes His Mind To Suit Occasion," and the other entitled: "Progress Is Made In Clearing Up Ogden City Water. Only Hundred Per Cent Pure Artesian Supply Is Pouring Into Reservoir and Pressure by Standard-Examiner and Chamber of Commerce Has Brought About Flushing of Dead Ends to Remove Suspicious Remnants; One New Case of Typhoid in Hospital." We quote such portions of the articles as might have a bearing on the issues involved in this controversy. In the issue of July 15th it was said:

"Mr. Williams said that when he declared he assumed responsibility for the turning of Wheeler creek water into the city mains, he assumed that responsibility as head of the waterworks department.

" 'I gave Mr. Packard, who knows more about the waterworks department than any other man, full responsibility of caring for the details of the operation of the system,' he said, 'I left it all up to him. While I feel the responsibility of my department, as its head, I do not feel that I was to blame for the turning of Wheeler creek into the system.

" 'As true as there is a God above, I'm telling you, I didn't know Wheeler creek was in the city mains. I gave Packard the responsibility of running the system. He told me this morning, when he offered his resignation, that he turned Wheeler creek into the system late in June, while I was on my vacation.

" 'Packard led me to believe that the wells were throwing plenty of water. When I received Dr. Beatty's letter telling me he thought Wheeler creek was being used I called Mr. Packard. This was on

about July 6. I asked Packard if Wheeler creek was in the system. He told me it was and I ordered him to cut it out at once. * * *

" 'Mr. Packard tendered his resignation to me this morning and accepted full and sole responsibility for Wheeler creek having been used. I will move to the commission that the resignation be accepted immediately. Mayor Francis and Commissioner Peery can then vote on it.' "

## The editorial published on July 16th had this to say:

"Citizens of Ogden, the present status of your water supply is a shame and a disgrace to the community and a menace to life and health. Three deaths from typhoid fever have occurred in as many days and many others are gravely ill with the disease. During all the time this has been occurring the city commission has put in its time manufacturing alibis and passing the buck.

"Fred E. Williams, water commissioner, in full charge of the department and with power of attorney, from the other two commissioners, according to their own admission, to handle the department as he pleases has proven himself absolutely incompetent for the job. On last Saturday he stated that he would assume all responsibility for turning the polluted waters of Wheeler canyon into the city mains. Yesterday he called God to witness that he knew nothing of what was going on in his department and attempts to shift the blame to Fred Packard, a paid employe of the department. It is a rank admission of ignorance and incompetency on the part of Mr. Williams as well as an attempt to seek cover.

"Williams has proven conclusively that he should be summarily removed as head of the water department in the interest of the life and health of the citizens of Ogden. To let him continue would be to encourage manslaughter. More innocent victims will fall before his defiance of law and his ignorance of the job he holds by the gift of the people.

"This water situation can be cleared up and that quickly and the good name of Ogden restored, but it cannot be done with Fred Williams on the job. He has made no effort to chlorinate the polluted waters turned into the city mains. He has been forced by the chamber of commerce to start cleaning out the 'dead ends' in the city mains which are a lurking place for messengers of death. As Harman Peery's 'yes' man he has sat around the city hall charging politics and trying to figure out alibis to stay on the city payroll regardless of the consequences to the public.

"The directors of the chamber of commerce after repeated insults and rebuffs from Williams and Peery are attempting to clean up the

nasty situation. The Standard-Examiner as the representative of the public at large will continue to keep its readers fully informed on this tragedy visited on the city by the water department. This newspaper is receiving letters and telephone calls from every part of the city commending it for its efforts to check the typhoid epidemic and expose those responsible for it. However, the situation demands more than verbal and written commendation.

"It demands immediate and decisive action and that action must come from the taxpayers and citizens of Ogden.

"Citizens of Ogden, this crisis calls for leadership. It calls for men and women of courage who will organize and see to it that Fred Williams resigns as head of the water department or failing in that, see that he is impeached for gross incompetency on his own admission. Do not be fooled by his plea of economy. The water department is transferring $75,000 a year into the general fund and there is no economy in sacrificing the lives and health of the community. The same commissioners preached economy when they were licensing bootleggers at $100 per month to sell whisky.

"Men and women of Ogden, it is your duty to see that Mr. Williams leaves the water department at once. You can't leave all the work to the chamber of commerce and The Standard-Examiner, but as long as he is there you will have no assurance that your water supply will be properly safeguarded, for he has proven himself unfit and unsafe for the job. Your lives and your health must no longer rest in his incompetent hands. Demand his resignation and see that it comes. This typhoid epidemic must not occur again. Your life, your health and the good name of Ogden must be protected."

### In the editorial of July 17th it was said:

"Peery's 'Yes' Man Changes His Mind to Suit Occasion

"July 7—City Commissioners lay plans to chlorinate Wheeler creek water and turn it into the city mains. It has not been used thus far this year, Commissioner Fred E. Williams said, and will be chlorinated before it is used.

"July 12—Commissioner Williams denies that Wheeler creek water is being used and says it will not be used until chlorinated.

"July 13—(Morning)—Commissioner Fred E. Williams said he did not know Wheeler creek water had been used, but that as head of the waterworks department, he would take full responsibility.

"He told the chamber of commerce special investigating committee later that morning that on July 6, as soon as he heard Wheeler water was being used, he instructed Fred Packard, assistant superintendent, to turn Wheeler creek water out of city mains. Mayor Francis re-

called that Commissioner Williams gave his word to the railroads and the state health department a year ago that Wheeler water would not be used until chlorinated.

"The same afternoon Mr. Packard told the chamber of commerce committee that Wheeler creek was turned out of the city mains immediately after he received instructions from Commissioner Williams either on July 10 or July 11.

"Commissioners Williams and Harman W. Peery and Mayor Francis assert they did not know Wheeler creek water was being used this year, until the state board called their attention to it. Francis and Peery said they had no way of knowing. Commissioner Williams, superintendent of the waterworks department, said he didn't know because he turned the entire operating of the department over to Packard.

"July 15, (Monday)—Fred Packard resigns and Williams tells him he won't accept the resignation. Later that morning Williams said he would move to the city commission that it accept the resignation. Packard accepts full responsibility for turning of Wheeler creek into city mains. M. E. Wilcox, owner of Pineview, where Wheeler creek enters Ogden canyon, announces he has had charge of the key to the Wheeler intake. He turned Wheeler water into city mains early in June, he said, as soon as the stream was clear. It has been in continuously until about July 11 or 12, he averred, with the exception of about two days along about the middle of June, when the creek was roily, and was turned out about July 10 or 11.

"'As true as there is a God above, I'm telling you, I didn't know Wheeler creek was in the city mains,' declares Commissioner Williams in asserting he had left the running of his department up to Mr. Packard, the assistant superintendent.

"Citizens of Ogden, are you going to leave an incompetent man like Fred Williams in charge of your water supply, or will you put in a man who will play square with the public and tell the truth?"

The other articles which were published subsequent to July 14th in appellant's newspaper contain statements of facts which are not in dispute, and which facts in the main have heretofore been recited in this opinion. Other facts which were established by the uncontradicted evidence are: That Ogden City had transferred about $75,000 per year from the revenue derived from the water department into the general fund; that there were fourteen known cases of typhoid fever during the summer of 1929, and three or four

others who probably had typhoid fever. Five died as a result of the disease. The usual period that elapses from the time typhoid germs are taken into the system until the symptoms of the disease develop is from a week or ten days to three weeks. The period may be shorter or longer. Coli bacilli is found in the excrement of human beings and warm-blooded animals. The presence of coli bacilli in water is indicative of but does not necessarily mean that the germs of typhoid fever are present. Water which shows an excessive amount of coli bacilli is unfit for culinary use unless it is boiled or chlorinated before being used. Mr. Packard continued to act as assistant superintendent of the Ogden City water system up to the time this action was tried. The record is silent as to whether or not his resignation was presented to the board of commissioners, and if so what action, if any, was taken thereon by the commission. The publication complained of was written by the defendant James P. Casey. Mr. Casey testified that he wrote the article with the sole purpose of protecting the citizens of Ogden from the threatened typhoid epidemic and that he had no ill will or desire to injure the plaintiff. Plaintiff testified that when he was elected to the office of city commissioner, Mr. Eldredge, one of the defendants, called him into his (Eldredge's) office and stated that Fred Packard had to go because he had insulted Mayor Francis, who was a former editor of defendant's newspaper; that Mr. Eldredge further stated there were other men who should not be retained in the employ of the city; that plaintiff had been elected with Mayor Francis and not with Peery. Plaintiff, according to his testimony, refused to follow the request. Mr. Eldredge was not called as a witness. Mr. Peery, the other commissioner, testified that both the chamber of commerce and the defendants' corporation were after both of us (meaning himself and Williams) because we would not play with them and listen to their dictations about city affairs; that he never thought there was anything wrong with the water and that he didn't think so now; that the

attack of the Standard-Examiner was just one of those attacks which it was in the habit of staging about every six months; that there had been feelings for years between the Standard-Examiner and the city commissioners. About 75 per cent. of typhoid epidemics are caused by the use of contaminated water. There is a conflict in the evidence as to these facts. Plaintiff testified that he told Mr. Packard in the summer of 1928 not to turn the water of Wheeler creek into the Ogden City water supply until it was chlorinated. A number of witnesses testified that Mr. Packard stated at the meeting held on July 13th that he turned the Wheeler creek water into the water system because that had been the custom for years; that no one had told him not to turn the water of Wheeler creek into the system; that he had never heard of an agreement whereby the city commissioners had promised not use Wheeler creek until it was chlorinated; that the water of Wheeler creek was turned out on July 11th. Mr. Packard testified in the cause but did not deny that he made the foregoing statements or that such statements were contrary to the facts, except that when he stated the water of Wheeler creek was turned out on July 11th he was confused about the date; that the water was turned out on July 8th. Defendant claims that there is evidence which shows that Wheeler creek was running in the reservoir early in June of 1929. There was offered in evidence the records kept at the city distributing reservoirs during the month of June, 1929. Those records showed that water, in addition to the artesian well water, was flowing into the distributing reservoirs. Plaintiff's evidence, however, tends to show that the additional water came from Warm spring and Cold Water, and not from Wheeler creek, prior to June 14, 1929, when admittedly the water from Wheeler creek was turned in. There is a sharp conflict in the evidence of the expert witnesses as to the cause of the outbreak of typhoid fever in Ogden in the summer of 1929. Numerous witnesses were examined touching that question. The state board of health made an investigation, as did also

Dr. L. L. Daines, professor and head of the department of bacteriology and pathology at the University of Utah, and Dr. J. E. Greaves, professor of bacteriology in the agricultural college of Utah. The city commission employed Drs. Daines and Greaves to make their investigation and report. The conflict in the testimony as to the source of the typhoid outbreak may be illustrated by the written reports rendered by the state health department and by Drs. Daines and Greaves. The last report rendered by the state health department reads as follows:

"The following report of the investigation of the State Board of Health of the recent typhoid outbreak in Ogden is supplemental to the preliminary report submitted July 23rd:

"Further investigation has furnished evidence which forces the conclusion that the contaimnated water from Wheeler Creek, which had been turned into the water system during the month of June, was responsible for the typhoid cases.

"As stated in the preliminary report, the water from Wheeler Creek, an open stream frequented by campers, had been proved by numerous laboratory tests to be dangerously contaminated, and its use for culinary purposes had been condemned by the State Board of Health. The Board did not possess the legal power to compel the purification of the water or the discontinuance of its use until purified, but after long continued effort had in 1928 secured the agreement of city authorities to turn out the Wheeler Creek water from the system until after the installation of chlorination apparatus. Notwithstanding this agreement and the proved impurity of the water, it was turned into the water system during the month of June and was not disconnected until July 8th, after the receipt of a demand from the State Board of Health dated July 5th that such action should be taken. The demand was made upon the discovery that the water supply was grossly contaminated and that Wheeler Creek water was entering the system.

"Cases of sickness began to appear in Ogden following June 20th which were for the first time called to the attention of the State Board of Health July 20th. The sickness proved to be typhoid fever of which fourteen cases were reported resulting in five deaths. The symptoms of the last cases began prior to July 7th, since which date no further cases have been reported in Ogden.

"The weather bureau reports show that on June 10th and June 16th rains had occurred in Wheeler Creek, flushing into the stream surface

impurities which might, and may now be stated without reasonable doubt did, include excreta deposted by a typhoid carrier. The typhoid cases occurred in two series sharply defined and separated, one beginning ten days to two weeks following the first rain, the usual incubation period of the disease, and the other a like period following the second rain. There were no cases in Ogden prior to the expiration of the first incubation period and no cases occurred after the incubation period dating from the second rain.

"Under such conditions the presumption that the infection originated in the water supply could only be set aside or controverted by definite and positive proof of some other cause. After a careful investigation and analysis of all possible factors, no evidence in substantiation of such cause has been discovered.

"Any possibility of milk as a cause was immediately ruled out by the fact that different milk supplies were consumed in each case. The alleged theory that the infection was contracted at certain restaurants can be wholly discarded. Four different restaurants have been mentioned as having been patronized by some of the cases. Others had not eaten at a restaurant. No typhoid carrier has been discovered serving food at any of the restaurants. It has been established that no foods that were open to suspicion to typhoid contamination have been dispensed by any of the restaurants.

"It is proper to assume that all of the cases reported had a common origin. The only substance consumed by all of them was the water from the public water supply. Any connection of the disease with the restaurants is further negatived by the fact that although the restaurants had been operating and serving hundreds of people before and after the sudden outbreak, no case of typhoid was contracted except during the few days covering the presence in the water system of the contaminated Wheeler Creek water following the rains. Even if such proof of water contaimination had not been established as a potential cause of the infection, it is impossible by the utmost stretch of imagination to conceive of circumstances that could suddenly convert the restaurants into typhoid 'depots' on the two separate and brief occasions which would be necessary in order to check with the periods of incubation of the two series of cases. It is to be deplored that on no more evidence than the fact that victims of typhoid had eaten at certain restaurants, the business of the restaurants, according to information received, has been seriously injured by alleged efforts to fix upon them responsibility for the disease. The aim and purpose of an investigation as to the cause of a typhoid outbreak should be solely to establish if possible the facts, in order that justice may be rendered to all concerned and to prevent a repetition of the misfortune.

"The possible connection with the disease of contaminated food products from the farming area west of Ogden was carefully studied. While the use for irrigation purposes in that section of water contaminated with Ogden sewage is an unsafe practice, both to the farmers and to persons consuming vegetables produced under such conditions, a fact which the State Board of Health has repeatedly called to the attention of the City and County officials and the farming community, there is nothing to show that it had any connection with the typhoid situation in Ogden.

"Of the two cases reported at Plain City, situated in the area in question, the first symptoms in one began July 10th, which was later than any of the cases that occurred in Ogden, and the history showed that the patient had drank water from an irrigation ditch ten days before. As was pointed out in the recent communication from the State Board of Health to the Ogden City Commission, the danger to those living in the area using irrigation water contaminated by Ogden sewage has been greatly aggravated by discharges from the typhoid cases, and its use was ordered discontinued by the State Board of Health. Steps should be taken before another season to purify this sewage if its use for irrigation purposes is permitted. The other case at Plain City contracted the disease at the same time as the later cases in Ogden and may have been infected in Ogden, which he visited daily, or at his home in Plain City from sewage contaminated water.

"In brief it may be repeated that all possible channels through which the typhoid infection might have been transmitted have been analyzed, and the final conclusion has been reached that the contaminated water supply was the cause of the outbreak.

"Chlorination of Wheeler Creek water, provision for which has now been made, will if properly operated hereafter insure the purity and safety of that source of supply. The major supply taken from the artesian wells has always been proved by tests to be pure and may be relied upon to continue to be an ideal supply if the further precautions recommended by the State Board of Health and the Engineer of the United States Public Health Service to safeguard its purity are carried out.

"If the recent lesson of the consequences of neglect of essential public health precautions is given serious consideration by the citizens of Ogden, and the employment of competent and reliable persons as guardians of the water supply is hereafter insisted upon, there need be no fear of future menace to the public health from that source."

The report rendered by Drs. Daines and Greaves reads thus:

"We have made as thorough a study of 'typhoid epidemic' which occurred in Ogden during part of June and July as is feasible at this late date and have the following to submit:

"There occurred in Ogden City during the months of June and July 1929, 14 cases which were typhoid fever. They originated between June 20, 1929 and July 4, 1929. There were 12 males and 2 females varying in ages from 8½ years to 58 years. Their occupations varied widely. They were grouped in three separate parts of the city. With one exception they all drank city water during the three weeks previous to the outset of the disease, and evidence points to the conclusion that during part of this time water from Wheeler Creek which gives test for B. coli was entering the city mains. Moreover all of these individuals ate at lunch stands within the city which had a common milk supply. Five of the 14 who contracted the disease died, i. e., there was a mortality of 35.7 per cent. Allowing for the variation which occurs in the incubation period of typhoid fever it is quite probable that they all contracted the disease at nearly the same period.

"The sudden outset of the disease together with polluted water in the city mains favors the theory of water borne infection. However there is strong circumstantial evidence against such a theory. (1) The limited number of cases. It is hard to understand why there were only 14 cases if water containing B typhous was being drunk by 30 or 40 thousand individuals. (2) The distribution of the cases. The cases were grouped in three rather distinct parts of the city and there is no evidence that water containing B typhous would reach these districts in preference to others. (3) There were some 70 individuals drinking the water from Wheeler Creek which would carry pollution in undiluted form as compared with the high dilution which would occur in the city mains. Yet we can find no evidence of any of these individuals having contracted typhoid fever. (4) The high mortality. (5) All individuals who contracted the disease ate at lunch stands which had a common milk supply (cans). (6) The first individual to contract the disease was a waiter at one of these lunch counters. The records show that he had had typhoid fever some 45 yrs. previously and during the latter part of May and first of June, 1929, he was ill. He recently gave a certain positive Weidal test for typhoid, which indicates his recent illness may have been typhoid fever, but in a mild form due to immunity carried over from the previous attack, or due to his being a carrier.

"It is therefore quite highly probable that this water either in the early stages of his recent illness or due to his being a carrier contaminated food which was the cause of the typhoid outbreak. This theory would account for the following: (1) The limited number of cases which is contrary to what would be expected in a water borne out-

break. (2) The distribution of the cases, all being traced to a common possible source of infection. It is not even probable that these individuals all just happened to eat at these stands and that there is no relationship between this and the outbreak of the disease. (3) The high mortality which could result from either massive infection or infection with highly virulent cultures, neither of which is probable in a water borne outbreak.

"It is therefore our opinion, based upon the limited available evidence, that the so called typhoid epidemic was due to food infection and not, as was first thought to be the case, the polluted water.

"However, in conclusion we wish to state that nothing in this report is to be construed as warranting the turning of water which gives the B. coli test into the otherwise ideal water supply of Ogden City. We feel that it cannot be too strongly stressed that this should never be permitted to occur again. For while it is our opinion that the water is in no way associated with the present typhoid outbreak yet the presence of a polluted water in the city mains is always a potential source of danger which with Ogden's available water is unnecessary."

In the foregoing statement of the evidence we have attempted to confine ourselves to such portions thereof as we deem necessary to serve as a background of our discussion and determination of the questions of law which are presented on this appeal. To recite even the substance of all of the evidence offered and received at the trial would extend this opinion beyond reasonable limits and would serve no useful purpose.

Appellant concedes, as well it may, that the publication complained of was libelous if it was false and not privileged. It is quite generally held that the truth of matters charged as defamatory exempts the publisher thereof from civil liability. Plaintiff makes no claim the law is otherwise. It is only in the event that defendant has published concerning plaintiff defamatory matter which is untrue that recourse need be had to the doctrine applicable to communications which are privileged. Privileged communications are of two classes: (1) Absolute privilege, and (2) qualified or conditional privilege. In the case of absolutely privileged communications the utterances or publication, although both false and malicious, does not give

rise to a cause of action. In the case of a qualifiedly or conditionally privileged communication the law raises merely a prima facie presumption in favor of the occasion. Both classes of privileged communications rest upon grounds of public policy,—the necessity of the individual to surrender his personal rights for the common welfare. A qualifiedly privileged communication "extends to all communications made bona fide upon any subject-matter in which a party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty; and the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character, of imperfect obligation." Newell, Slander and Libel (4th Ed.) § 341, pp. 380, 381, and cases there cited; *Spielberg* v. *A. Kuhn & Brother,* 39 Utah 276, 116 P. 1027. The publication here in question clearly falls within that class of communications which are qualifiedly or conditionally privileged. When the publication was made, two residents of Ogden City had died from typhoid fever and others were seriously sick with that disease. There was grave danger that the disease would spread. That appellant and the residents of Ogden City had a common interest in the threatened typhoid epidemic, in its source, and in the prevention of its spread, is not open to question. It is equally clear that appellant and the inhabitants of Ogden had a common interest in fixing, if possible, the responsibility for the outbreak of the disease, and in taking such steps as might be necessary to check its spread and prevent its recurrence. Information concerning the manner in which plaintiff as city commissioner in charge of the waterworks department of the city had been and was handling the city culinary water supply was likewise a matter of common interest to appellant and the citizens of Ogden. 36 C. J. 1284, § 291, and cases there cited; *People* v. *Glassman,* 12 Utah 238, 42 P. 956. Appellant by informing its readers upon such matters was performing a duty which falls within that class mentioned in the rule as "of

a moral or social character of imperfect obligation." Such were the views entertained by the trial court. The jury was instructed that the publication complained of was qualifiedly privileged. Respondent has not assigned the giving of such instruction as error.

When, as in the instant case, the publication was qualifiedly privileged, the burden of proving malice in fact or actual malice, as distinguished from malice in law or implied malice, was cast upon the plaintiff. *Spielberg* v. *A. Kuhn & Brother,* supra. The doctrine announced by this court in that case is in accord with the weight of judicial authority. Cases which support the majority rule, as well as those to the contrary, will be found annotated in 54 A. L. R. beginning at page 1143.

Whether appellant's motion for a nonsuit should or should not have been granted depends upon how the following questions are answered: Were the statements of facts contained in the publication true? If not true, was the publication made in good faith, without actual malice, and with reasonable or probable grounds for believing it to be true? Were the comments and criticisms contained in the publication declared on concerning the manner in which respondent conducted the waterworks system, and how he should be dealt with because of his conduct in such respect, reasonable and fair, in the light of the facts and circumstances that existed or appeared to exist at the time such comments and criticisms were published? As heretofore stated, most of the statements made in the publications declared on are true. While there was a conflict in the evidence at the trial as to the probable source of the typhoid epidemic, such conflict was based upon investigations made after the publication of the matters complained of. On July 14th, when the article was published, the facts then available pointed to the water of Wheeler creek as the source of the disease. Such were the expressed views of the state health commissioner, of the Ogden city physician, and of other doctors familiar with the available facts. Such

remained the views of the state health department after making a thorough investigation of the facts. The expert witnesses, who were called by plaintiff, while expressing the opinion that the outbreak of the typhoid epidemic was not the city water supply, were none the less agreed that it was a serious mistake to turn water containing an excessive amount of coli bacilli into the water supply of Ogden City and "that it cannot be too strongly stressed that this should never be permitted to occur again." Upon this record the only conclusion permissible is that at the time appellant published the various articles which were received in evidence there was probable cause for believing that the typhoid epidemic which occurred in Ogden in the summer of 1929 was caused by the water of Wheeler creek being turned into the city water supply. In this connection it should be noted that if appellant was to perform any service to the citizens of Ogden by way of preventing a further spread of the disease, it was necessary that they be warned of the danger at once. To have waited for an investigation before informing them of the threatened danger might well have cost the lives of more of the residents of that community.

Respondent contends that the publication declared on expressly charged him with the commission of the crime of manslaughter and that in no event is such a charge permissible unless it is true. Cases dealing with that question will be found collected in 17 R. C. L. page 355, § 103. The language used in the publication falls short of charging the plaintiff with manslaughter or any other crime. Most of the language declared on does not purport to be a statement of the facts but is in the nature of comment upon the facts and a criticism of the acts of respondent and those in charge of the waterworks department. Under the heading quoted in the complaint, "Williams Avers He's Responsible For Bad Supply. Commissioner Fred E. Williams of the Waterworks Department admitted yesterday that if there was any blame to be placed for the use of the Wheeler Creek

water, he would accept responsibility. Further he asserted, my shoulders are broad enough to carry it," was published a full, fair, and substantially true statement of the history of the controversy about the Wheeler creek water, of what occurred at the meeting held the day before, of the views of the state health commissioner, of the Ogden City physician, and of other physicians with respect to the cause of the typhoid epidemic. It also contained an accurate account of an interview had by a representative of appellant with the respondent. All the remainder of the language set out in the complaint is quoted from two articles, one entitled, "Boil Your Water, Don't Drink From Fountains," and the other an editorial published in the editorial column under the heading "Typhoid Fever is Manslaughter." If appellant is to be held liable in this case, it is because of its comments and criticisms contained in the two articles just referred to, rather than because it misstated the facts which formed the basis of such comments and criticisms. The law applicable to what may and what may not lawfully be said by way of comment and criticism is thus stated in Newell on Slander and Libel (4th Ed.), beginning on page 520:

Sec. 481. "Criticism differs from defamation in the following particulars.

"1. Criticism deals only with such things as invite public attention or call for public comment. It does not follow a public man into his private life or pry into his domestic concerns.

"2. It never attacks the individual, but only his work. Such work may be either the policy of a government, the action of a member of a legislative body, a public entertainment, a book published or a picture exhibited. In every case the attack is on a man's acts, or on some thing, and not upon the man himself. A true critic never indulges in personalities, but confines himself to the merits of the subject-matter.

"3. It never imputes or insinuates dishonorable motives unless justice absolutely requires it, and then only on the clearest proofs.

"4. The critic never takes advantage of the occasion to gratify private malice or to attain any other object beyond the fair discussion of matters of public interest, and the judicious guidance of the public taste. He carefully examines the matter, and then honestly and fearlessly states his true opinion of it."

Sec. 482. "Every person has a right to publish such fair and candid criticism, although the author may suffer loss from it. Such a loss the law does not consider as an injury, because it is a loss which the party ought to sustain. It is, in short, the loss of fame and profits to which he was never entitled. Reflection upon personal character is another thing. Liberty of criticism must be allowed or we should neither have purity of taste nor of morals. Fair discussion is essentially necessary to the truth of history and the advancement of science. A publication, therefore, which has for its object, not to injure the reputation of any individual, but to correct misrepresentations of fact, to refute sophistical reasoning, to expose a vicious taste in literature, or to censure what is hostile to morality, is not actionable. The critic must confine himself to criticism and not make it the veil for personal censure, nor allow himself to run into reckless and unfair attacks merely from the love of exercising his power of denunciation."

Sec. 483. "Criticism and comment on well-known or admitted facts are very different things from the assertion of unsubstantiated facts. A fair and bona fide comment on a matter of public interest is an excuse of what would otherwise be a defamatory publication. The statement of this rule assumes the matter of fact commented upon to be somehow ascertained. It does not mean that a man may invent facts, and comment on the facts so invented in what would be a fair and bona fide manner on the supposition that the facts were true. If the facts as a comment upon which the publication is sought to be excused do not exist, the foundation fails. There is no doubt that the public acts of a public man may lawfully be made the subject of fair comment or criticism, not only by the press, but by all members of the public. But the distinction cannot be too clearly borne in mind between comment or criticism and allegations of fact, such as that disgraceful acts have been committed, or discreditable language used. It is one thing to comment upon or criticize, even with severity, the acknowledged or proved acts of a public man, and quite another to assert that he has been guilty of particular acts of misconduct. To state matters which are libelous is not comment or criticism."

## In 36 C. J., beginning on page 1282, it is said:

Sec. 285. "Comment or criticism consists of opinions or inferences from facts assumed to be true. An allegation of fact may be justified by its being an inference from other facts truly stated; but if the opinion or inference is not stated as such, but as facts, its truth must be established; and there is no immunity if there is no foundation in fact for the inference or opinion. The right of comment is not restricted to a restatement of the naked facts. As a

general rule it may include the right to draw inferences or express opinions from facts established. The soundness of the inferences or opinions is immaterial whether they are right or wrong, provided they are made in good faith and based upon the truth. So comment or criticism may include the inference of motives for conduct in fact exhibited if there is foundation for the inference."

Sec. 286. "While there are dicta to the effect that if the comment or criticism is true and made bona fide, immunity from civil liability therefor exists whether it is reasonable or unreasonable, it is generally held that the comment or criticism in order to receive immunity from civil liability, or to be privileged, must be reasonable and fair."

Sec. 287. "The criticism may be severe, harsh, bitter, or sarcastic. Mere exaggeration, ridicule, or even gross exaggeration does not of itself make the comment or criticism so unfair as to destroy the immunity. It is generally held that such comment may be caustic or severe if the facts warrant it."

Sec. 288. "It is generally held that express malice defeats the defense of comment and criticism, whether it is viewed as a separate defense or an instance of qualified privilege. On the other hand it has also been held that the motive of the commentator, or critic, if he keeps within the bounds of comment or criticism, is immaterial."

### In the instant case the trial court instructed the jury that:

"You are instructed that manslaughter, under the laws of this state, is the unlawful killing of a human being without malice, and is of two kinds: Voluntary and involuntary.

"Involuntary manslaughter is the unlawful killing of a human being without malice in the commission of a lawful act which might produce death in an unlawful manner, or without due caution and circumspection.

"You are instructed that carelessly or without due caution and circumspection to permit impure or polluted water carrying indications of typhoid fever infection to flow into the waters and water mains furnishing water to the inhabitants of Ogden City might constitute the crime of involuntary manslaughter. That is to say, if the plaintiff, as the city commissioner of Ogden City having direct charge of the water works department, during the times alleged in plaintiff's complaint herein, with knowledge or in the exercise of due care and circumspection might have acquired knowledge that such polluted water was flowing into such water mains, negligently and without due caution and circumspection allowed unchlorinated water to be served from an impure source of supply through city water mains to the inhabitants of Ogden City, and that a typhoid fever epidemic

resulted therefrom, causing the death of one or more persons from such disease, that such conduct on the part of the plaintiff would constitute the crime of manslaughter of the grade of involuntary manslaughter under the law."

Upon this appeal respondent makes no complaint of the foregoing instruction. If there was any inaccuracy in that statement of the law it has not been pointed out. We repeat the facts which tend to support each of the elements necessary to establish the crime of involuntary manslaughter as defined in the foregoing court's instructions to the jury: The water of Wheeler creek was polluted with such an amount of coli bacilli in 1928 that it was unsafe for use. The city commissioners knew such facts and agreed not to use the water of that creek until it was chlorinated. It was turned into the water system of Ogden without being chlorinated and without any attempt being made to ascertain whether or not the water of that creek was safe for use. A typhoid fever epidemic broke out in Ogden City which might well have been caused by the use of the water from Wheeler creek. Two persons had died from that disease at the time the publication was made. Plaintiff stated that he as commissioner of the waterworks department assumed the responsibility for turning the Wheeler creek water into the water system of Ogden. If established facts bespeak a crime has been committed, civil liability does not attach to one who charges such facts as a crime. *Klinck* v. *Colby*, 46 N. Y. 427, 7 Am. Rep. 360. To conclude from the facts disclosed by this record that the one responsible for the turning of the Wheeler creek water into the Ogden City water system was guilty of manslaughter, as defined in the trial court's instruction to the jury, may not be said to be unreasonable. That respondent was derelict in his duties if he failed to take measures to see that Wheeler creek water was not turned into the water system during 1929 unless it was chlorinated is not open to question. Much of the evidence tends to show that he did not perform that duty. He did testify at the trial that

he informed Mr. Packard in 1928 not to turn the water of Wheeler creek into the city water system, but he made no such claim as far as appears prior to the time of the publication declared on. The dereliction to perform such duty upon a matter so vital to the health and lives of those who were using the water of Ogden City may justly call for the expression of honest indignation. A public officer who is guilty of dereliction of a duty which may, and there is probable cause to believe does, result in the loss of human life, may not be heard to complain merely because plain and severe language is used to condemn his failure to perform his duty. One who makes malicious charges of a defamatory character of a public officer without probable cause for believing such charge to be true is not shielded against liability; but, on the other hand, a public officer who fails to perform his duty to the public is not shielded from criticism honestly made even though the language of such criticism of a public officer who has apparently been derelict tinctions as to the kind of language that may be used in the riticism of a public officer who has apparently been derelict in the performance of the duties of his office. The comments and criticisms declared on may not be said to give rise to civil liability in the absence of proof that they were published with malice in fact or actual malice. There is some judicial authority which seems to be to the effect that no civil liability attaches to the publication of a qualifiedly privileged communication where it is made to appear there was probable cause for believing the publication to be true. Those authorities seem to proceed upon the theory that the law of malicious prosecution is applicable to slander and libel—the latter being but a form of the former. It is quite generally held in actions for malicious prosecution that the existence of probable cause defeats the action. If actions for slander and libel are a species of actions for malicious prosecution, it would seem to follow that as the latter action is defeated by the presence of probable cause the same rule should be applied to the former actions. However, the

great weight of judicial authority as well as the text-writers support the view that the presence of probable cause does not defeat an action founded upon a qualifiedly privileged communication if the defamatory matter was uttered or published with actual malice. It is quite generally held that a defendant who publishes or utters a qualifiedly privileged communication containing defamatory matter with the intent or motive of injuring the plaintiff is not protected by the privilege even though there was probable cause for believing the utterances or publication to be true. The authorities, however, are all to the effect that the presence of probable cause for believing the truth of a qualifiedly privileged communication is important as evidence of good faith and of the absence of malice in fact. At the outset of our examination of whether or not there was sufficient evidence to go to the jury on the question of the motive or intent of appellant in publishing the matters complained of, we are confronted with the rule of law which casts the burden on the plaintiff to establish actual malice, and with the fact that the publication here involved was either true or there was probable cause to believe it to be true. The evidence which respondent claims supports the burden cast upon him is: (1) That Joseph U. Eldredge, Jr., general manager of the appellant about eighteen or twenty months before the time of the publication declared on, stated to plaintiff that the superintendent of Ogden City waterworks must be discharged and that other changes must be made in the personnel of the city employees, but plaintiff refused to comply with the request; (2) the testimony of Mr. Perry, the other commissioner, to the effect that for a number of years prior to the date of the publication an ill feeling existed between the appellant on the one hand and plaintiff and himself on the other; (3) that the language of the publication declared on and the language of some of the comments and criticisms published thereafter contained such intemperate and exaggerated statements as to indicate the writer thereof was prompted by ulterior motives. The ques-

tion of whether a qualifiedly privileged article is written or published with malicious motive or otherwise is, generally speaking, a question of fact to be determined by the jury. However, in the absence of proof that such communication was published with actual malice, it is within the power and duty of the courts to say as a matter of law that the motive of the publication was without malice. The fact that plaintiff and general manager of appellant had a disagreement some eighteen or twenty months before the time in question as to who should be appointed to one or more of the city offices can have but little, if any, probative value in determining the motive which prompted the publication of the article in question. Disagreements are common and of everyday occurrences between the best of friends as well as between enemies. Ill will may or may not be engendered by disagreement. It is rare indeed that ill will is nourished for a period of eighteen or twenty months and then manifests itself in a slander or libel. The testimony of Commissioner Perry is likewise of little probative value. While his testimony was to the effect that defendant was in the habit of saying unpleasant things about himself and plaintiff about every six months, he does not advise us of the nature thereof or whether they were true or false. As we view this record, the only evidence offered by plaintiff which has any substantial bearing upon the motive which he claims prompted the publication of the articles in question is the publication itself and the articles which were published thereafter. It is true that some of the language used in the articles by way of criticizing plaintiff was severe, but that alone, as we have heretofore indicated, is not sufficient to support a finding that the motive which prompted the writing of the article declared on was actual malice. The occasion was such as to merit criticism, and the language of those articles is not inconsistent with honest indignation in the light of the established facts and circumstances surrounding the occurrence. It is such language as might well be expected from one who honestly believed that the

typhoid epidemic with its suffering and loss of human life was caused by the failure of those in charge of the waterworks department to perform their plain duty. To say that the writer and publisher of the articles here in question was motivated by a desire to injure plaintiff rather than for the purpose of promoting the public weal would be a mere guess. Upon this record a finding that the article declared on was published with malice in fact is without any substantial evidence to support it. There is an abundance of evidence tending to show that the articles were published with a proper motive.

We are of the opinion that the court below was in error in refusing to grant the motion for a nonsuit and the motion for a directed verdict.

Appellant also complained because the court below by its instructions permitted the jury to award plaintiff punitive damages. In the view we take it was error to submit the question of general damages to the jury, and therefore it follows that it was likewise error to permit the jury to award exemplary damages. So also does appellant complain because the jury was by the court permitted to consider a subsequent publication, not only as bearing upon the question of malice, but also as bearing upon the question of aggravation of damages. The evidence being insufficient to sustain a judgment for general damages, the subsequent publication could not aggravate damages to which plaintiff was not entitled.

In its motion for a new trial appellant contended that the jury having found for the defendants Joseph U. Eldredge, Jr., Abraham L. Glasmann, and James P. Casey, it follows as a matter of law that the verdict against the defendant corporation cannot stand. The argument is made that if there were an absence of malice in fact on the part of the personal defendants who wrote and published the article complained of there could be no malice in fact on the part of the appellant corporation. Having reached the conclusion that a new trial must be granted because of a failure of

proof of malice in fact on the part of any one connected with the publication declared on, it becomes unnecessary to further consider that phase of the case.

The wife of plaintiff was permitted to testify concerning certain communications she had over the telephone. She made no claim that she informed the plaintiff of those conversations. At the conclusion of her evidence appellant moved to strike all of her testimony with respect to such communications. The motion was denied. Error is assigned because of that ruling. We are of the opinion that the motion should have been granted. However, the matters concerning which Mrs. Williams testified were not of sufficient moment, standing alone, to justify a disturbance of the verdict and judgment.

For the reasons stated the judgment is reversed. This cause is remanded to the district court of Weber county, with directions to grant a new trial. Appellant has printed a very voluminous abstract of the evidence. It contains a verbatim copy of nearly all the questions asked and the answers given by the various witnesses who testified at the trial. The evidence could have been condensed so as to require about one-half the space actually used. Because of that fact appellant should not be awarded costs for the printing of the entire abstract. Appellant is awarded its costs, but in computing the same respondent should be required to pay for only one-half of the abstract. Such is the order.

FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.

STRAUP, Chief Justice (concurring).

I fully concur in the result. I, however, disagree with the statement in the opinion that there was a "sharp conflict in the evidence of the cause of the outbreak of typhoid fever." I think there was no substantial conflict. There is no conflict in the evidence that during the period in question the waters of Wheeler creek turned in the water system

were, by laboratory tests and examinations, found to carry colon bacilli, that the waters were so dangerously contaminated as to cause typhoid fever, and that about 75 per cent of such diseases were due to drinking or using such or similar contaminated and polluted waters. By the testimony of officers both of the state and local health departments, as well as by other physicians having personal knowledge of such contaminated and polluted conditions of the waters, and of the diseases, and their cause, it was shown that the cause and spread of the disease of typhoid was due to such contaminated and polluted conditions. We thus have positive and direct evidence of witnesses with personal knowledge of the facts and of records as to the cause of such disease and the spread of it.

As against that we have nothing but speculation, conjecture, and argument of several biologists, who had made no test or examination of the waters in question, who in no particular disputed the polluted and contaminated condition of such waters, and who admitted that about 75 per cent of typhoid diseases were due to such conditions. They in effect testified and admitted that the report made by them and filed with the city commissioners and put in evidence was not based on matters of which they had personal knowledge, but on information given them by others, some of which was shown to have been unfounded in fact. They reported that all the individuals who contracted the disease "ate at lunch stands" which had a common milk supply. Such statement was based merely on hearsay. No evidence was given to show that such milk supply or food furnished at any of such places carried typhoid germs or was in any particular contaminated, polluted, or impure. They further reported that the first individual to contract the disease was a waiter "at one of these lunch counters." There is no evidence whether such was the case or not. They further say that such individual had typhoid fever 45 years previously and that during the latter part of May or the first part of June, 1929, "he was ill"; that he recently gave a certain positive

Weidal test for typhoid "which indicates his recent illness *may have been typhoid fever,* but in a mild form due to immunity carried over from the previous attack or due to his being a carrier"; and thus they further reported that it was "highly probable that this waiter in the early stages of his recent illness or due to his being a carrier contaminated food which was the cause of the typhoid outbreaking." In other words, the illness of the waiter may have been "typhoid"; ergo, if he had typhoid, he may have contaminated milk or food at lunch counters where others ate, without a showing that any such supply or food was contaminated. When the biologists were advised that the individual referred to was not a waiter at any of the lunch counters until after the illness of those suffering from typhoid, they answered that he might have been about there and become a carrier by shaking hands or the like with those at or about the lunch counter. But no evidence was given to show that the waiter did so, or that those who ate at the lunch counter even touched the hem of his garment. In giving their testimony, the biologists did not say, as indicated by their report, "highly probable," but that "it was possible," that the epidemic was due to eating contaminated food by those suffering from the disease or by coming in contact with others carrying germs of the disease. Further argument was made by them that if the polluted and contaminated waters were the sole cause of the epidemic they would expect a much larger number of cases of typhoid than was reported. And since the spread of the disease caused from contaminated foods is not likely to be so great or extensive as when caused by a common supply of contaminated drinking water; ergo, the cause of the epidemic in question was from contaminated foods and not from the common supply of admitted and indisputable contaminated and polluted waters. Further, they reported and testified that they talked with divers persons who drank water from Wheeler creek and from the waterworks system and learned that none of those had contracted the disease; ergo, the

admitted contaminated waters were not the cause of the epidemic, or that the epidemic was equally attributable to other causes. As well say Jane and Mary slept with the maid who admittedly had the itch, and in due course they broke out with the disease; others slept with the maid and did not contract the disease; ergo, Jane and Mary must have contracted the disease elsewhere without any showing that it was so contracted except argument that it "might have been," that it was "possible," that it could have been, contracted elsewhere, for we all may get the itch without sleeping with maids.

On the record no one may successfully, no one does, controvert that there is sufficient positive and direct evidence to justify a finding that the contaminated and polluted waters were the immediate and consequential cause of the epidemic. On the contrary, a finding that the epidemic was due to contaminated food, or to a cause other than the contaminated waters, would on the record have no support other than by mere argument and conjecture without evidence to justify either. Thus on the record the only natural and consequential cause of the epidemic was due to the contaminated and polluted waters. To argue that it might have been caused from food eaten or milk drank at the lunch counter, without any evidence that such food or milk supply was in any particular impure or contaminated, argues nothing.